NATHANIEL K. RISCH
TYLER L. MANN
———————
ALLISON N. BUSH

TYLER@MANNRISCH.COM

LAW OFFICES OF
# MANN & RISCH
A LIMITED LIABILITY COMPANY

101 EAST CHESAPEAKE AVENUE, SUITE 403
TOWSON, MARYLAND 21286

(410) 929-5145  MAIN
(410) 307-1007  FAX

WWW.MANNRISCH.COM

August 22, 2022

<u>By PACER</u>
The Honorable George L. Russell III
United States District Court for the District of Maryland
101 W. Lombard Street
Chambers 7A
Baltimore, MD 21201

    RE:   *United States v. Terrell Walton*
           <u>Criminal Case No. GLR-20-0210</u>

Dear Judge Russell:

    I write to you on behalf of my client, Mr. Terrell Walton, who is to be sentenced on September 9, 2022, at 2:00 pm. After a jury trial, Mr. Walton was found guilty of Count One: Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841 (b)(1)(B). In anticipation of the upcoming sentencing hearing, I wanted to provide the Court with some general information about Mr. Walton and this case to ensure that the Court sentence Mr. Walton to the requested 92 months.

**Personal History**

    Mr. Walton was born on July 21, 1986, in Havre de Grace, Maryland to Michael Walton and Patty Ann Washington. Mr. Walton's parents never married, and he is their only child. Mr. Walton grew up with his father and only saw his mother on special occasions.

    Mr. Walton's childhood was riddled with instability, exposure to drugs, and poverty. Throughout his childhood, Mr. Walton watched his father struggle with addiction to crack cocaine. His father was in and out of jail as a result of his drug problems. While his father's jail sentences were usually short in duration, they were frequent in quantity. When his father was in jail, Mr. Walton would sometimes stay with his mother, but would often stay with his paternal grandparents. When Mr. Walton's father was home, he maintained steady employment as a cook, but did not have enough money to support himself and Mr. Walton. Because of this, the two lived in section 8 housing and usually only had one bedroom to share. To this day, Mr. Walton and his

father maintain a very close relationship and frequent contact. However, Mr. Walton and his mother maintain very little communication.

Despite being the only child born from the union of his parents, Mr. Walton has a few half siblings on his mother's side, namely 38-year-old Mark Hilyard, 34-year-old Ashley Washington, and 28-year-old Alicia Washington. Mr. Walton maintains a good relationship and regular contact with both of his maternal half-sisters.

Growing up, Mr. Walton attended schools in the Harford County School System. He went to Aberdeen High School where he completed the tenth grade. While Mr. Walton did not obtain his high school diploma at Aberdeen High School, he went on to earn his GED in 2012 while incarcerated at Western Correctional Institution. Since then, Mr. Walton has gone on to earn a few certificated in different disciplines, namely a carpentry certificate in 2014, a sheet metal certificate in 2015, and a graphic arts certificate in 2019.

Mr. Walton has a long history with mental health issues dating back 2008 when he was like 22 years old. At this time, Mr. Walton was serving his first significant amount of time in jail. On top of that, right before that term of incarceration began, Mr. Walton's best friend had just been murdered. The stress of losing such a close friend, coupled with the stress of serving a lengthy sentence took its toll on Mr. Walton. He was having a hard time adjusting because of this and it greatly affected his mental health. Mr. Walton was prescribed Thorazine while incarcerated in an attempt to cope with his mental health issues. Mr. Walton was on this medication for approximately the next 18 months. Years later, in 2021, while Mr. Walton was incarcerated in Warsaw, Virginia, he attempted suicide. Mr. Walton states that the reason for this suicide attempt was because of the terrible conditions he faced while incarcerated there and the fact that he was frequently being placed in solitary confinement. After this incident, Mr. Walton was transported from Warsaw, Virginia to Chesapeake Detention Facility.

Mr. Walton has also had a long history with substance abuse. At just 9 years old, Mr. Walton began drinking alcohol. This habit stayed with him throughout his adult life as Mr. Walton states that he has been drinking alcohol all day every day for years. A few years later, at age 11, Mr. Walton began using marijuana. This too stuck with him and until his instance arrest had been his daily drug of choice. At age 16, Mr. Walton used Ecstasy for the first time. He continued using ecstasy weekly up until his instance offense. Interspersed with the regular alcohol, marijuana, and ecstasy use, Mr. Walton experimented with Xanax a few times in his teenage years. This however did not turn into a habit for Mr. Walton as he did not like the affects of the drug. The only treatment Mr. Walton has received for his substance abuse issues was a five-month substance abuse program through Gaudenzia that he successfully completed in 2014 while incarcerated. Mr. Walton hopes to receive further substance abuse treatment while incarcerated or upon supervised release.

Mr. Walton is not married but has been in a relationship with Tiedre Wilson since the two were children. They were living together in Elkton, Maryland up until his current arrest. He and Ms. Wilson do not have any children together. The couple maintains regular communication and Ms. Wilson has been a big source of support for Mr. Walton.

Mr. Walton is generally in good physical health with the exception of an injury to his left leg that he sustained in a car accident less than two weeks before his arrest. The injuries he sustained in that collision have resulted in bone growing on top of bone on his left leg that will require surgery to correct. This injury causes Mr. Walton constant pain and causes him to walk with a limp. Mr. Walton is not prescribed any medication for the pain but is currently using Tylenol on a regular basis in an attempt to cope with the pain.

Mr. Walton has limited employment history. Prior to his arrest in 2021, Mr. Walton worked at a Lidl Warehouse in Cecil County, Maryland and at International Paper Warehouse in New Jersey. Since Mr. Walton's instant arrest, he has not had any form of employment and therefore has no income.

## Criminal History

The Presentence Investigation Report classifies Mr. Walton as a criminal history category V, with a score of eleven. Mr. Walton's criminal record dates back to 2005 when he was just 19 years old. However, Mr. Walton has only three criminal convictions. His criminal history score is correctly calculated in the presentence report, and Mr. Walton vehemently objects to an upward departure.

## Nature and Circumstance of the Offence

Mr. Walton accepts full responsibility for his actions in this indictment. As was expressed at trial, Mr. Walton never denied distributing drugs, it was the quantity the Government alleged, that was at issue.  When interviewed by the Ms. Cameron for the PSR, Mr. Walton advised he respected the jury's decision in the case.  Mr. Walton certainly understands the seriousness of distributing drugs, but felt he had little other choice to provide for himself and his loved ones.

## Response to Governments Request for Upward Departure and Variance

The Government is seeking an outrageous upward variance of 65 months over the top of the guidelines.  This upward variance is based on Government's conclusion that Mr. Walton is guilty of assaulting individuals at two institutions, the characterization that his criminal history category inadequately represents his criminal history, and his likelihood of recidivism.  The Defense vehemently objects and disputes each of these points.

The Government submits reports from Northern Neck Regional Jail as proof of Mr. Walton's dangerousness. These reports are filled with unreliable hearsay. The first mention of Mr. Walton is in regards to a June 13, 2021 stabbing incident. Even if this information in these reports was reliable, and the Defense does not submit they are, another inmate stabbed the victim. The remainder of the reports revolve around rudeness to staff, certainly common in jail, and alleged contraband, where Mr. Walton is one of five other inmates alleged involved.

In regards to the April 10, 2022 incident at Chesapeake Detention Facility, it is alleged that Mr. Walton assaulted Che Durbin, his co-Defendant, in the eye and ear. No contraband was recovered from the scene and neither Mr. Walton or Mr. Che Durbin cooperated with staff. The sole evidence that Mr. Walton was the perpetrator is an alleged statement to Capt. Dabbs, in which Mr. Walton admitted to the assault because "Durbin, snitched like a bitch." This statement is contradictory to evidence from trial, that although Mr. Durbin did testify on his own behalf, he made no statements in regards to Mr. Walton.
To hold this against Mr. Walton violates his due process rights, and essentially forces the Defense to fight a case in which he is not been charged.

Mr. Walton's criminal history is poor. His criminal history category is a V, with a score of 11. Despite a poor record being considered by the Federal Sentencing Guidelines, the Government attempts to use acquitted charges against Mr. Walton as evidence of his dangerousness. The Government cites no additional information, only relying on the fact that this case is Mr. Walton's third felony durg offense as evidence of his risk of recidivism. Essentially arguing the State courts were being too lenient. This characterization violates Mr. Walton's due process rights. Though his record is admittedly poor, it is not so exceptional that an outrageous 65-month upward variance is called for. The sentencing guideline framework allocates for a poor record, and in Mr. Walton's case sets the appropriate guidelines at 92-115 months.

## **COVID-19**

Keeping individuals incarcerated in facilities where the COVID-19 virus is running rampant is a violation of the inmates' 8th amendment protections against cruel and unusual punishment. The 8th amendment of the United States Constitution states that cruel and unusual punishments shall not be inflicted. USCS Const. Amend. 8. "The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)). "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a

prisoner to a sufficiently substantial 'risk of serious damage to his future health…'" *Id*. at 843 (quoting *Helling v, MicKinney*, 509 U.S. 25, 35 (1993)).  To show "substantial risk" the inmate must be able to show that "he is incarcerated under conditions posing substantial risk of serious harm." *Id*. Deliberate indifference must be more than mere negligence but can be satisfied by "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 836.

While an "accidental or inadvertent failure to provide adequate medical care to a prisoner would not violate the Eighth Amendment, 'deliberate indifference to serious medical needs of prisoners' violated the amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standard of decency." *Helling*, 509 U.S. at 32 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

COVID-19 pandemic in jails and prisons has caused and is continuing to cause terrible living conditions for the inmates. The densely populated facilities and close living quarters makes it difficult, if not impossible, to follow safety precautions to stop the spread of the virus among inmates. Being confined to these dormitory style living spaces where social distancing is not possible only facilitates the rapid spread of an already quickly spreading deadly disease. Keeping inmates in such close quarters puts the inmates in harm's way, especially inmates who are elderly and/or inmates who have compromised immune systems. Being forced to live in these conditions where adequate medical care may not be available and where the rapid spread of the virus from inmate to inmate and correctional officer to inmate, constitutes a serious risk to the future health of the inmates.

The conditions in which inmates are living and the constant risk of being exposed to the virus has created dangerous and deadly conditions for the inmates and serious risks to their future health that constitutes a violation of the inmates' 8th amendment protections against cruel and unusual punishment.

### Downward Variance from Federal Sentencing Guidelines or a 2-Point Reduction in Federal Sentencing Guidelines

The impact that the COVID-19 pandemic has had on correction facilities and the inmates incarcerated in these facilities constitutes a mitigating circumstance not taken into consideration when sentencing guidelines were originally formulated and therefore warrants individualized sentences, varying downward from the original guidelines.

18 USCS § 3553 (a) defines the factors to be considered by the Federal Courts when imposing a sentence and includes such factors as the nature and circumstance of the offense, history of the defendant, the need for the sentence, the sentencing ranges established, and more.

18 USCS § 3553 (b)(1) provides some guidance for the application of the sentencing guidelines when imposing a sentence and states, in pertinent part:

> "Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

28 USCS § 991 (b)(1)(B) states that the purpose of the United Stated Sentencing Commission is to:

> "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices …"

This reference to taking into account mitigating or aggravating circumstances not initially considered in the making of the guidelines that warrant individualized sentences found in both sections shows the importance of the individualized sentence when certain circumstances, such as the unprecedented circumstances of the COVID-19 pandemic, are occurring that were not considered when creating the sentencing guidelines.

Because the factors taken into consideration under § 3553 (a) do not include unprecedented or extraordinary circumstances such as those being experienced due to the COVID-19 pandemic, § 3553 (b)(1) becomes even more important.

Due to the fact that there was no way the circumstances surrounding the COVID-19 pandemic could have been considered when originally creating sentencing guidelines, the current circumstances should be considered a mitigating factor not taken into account when creating the guidelines and therefore warrant individualized sentences, differing from the guidelines, taking into consideration the effect of the COVID-19 pandemic.

**Conclusion**

Mr. Walton respectfully submits that a sentence of 92 months is the appropriate sentence for this particular offense. He acknowledges that he made a series of grave and poor decisions that will affect him and his family for the rest of his life. However, Mr. Walton is not a violent or dangerous person. He is not someone who the public must be protected from by way of a lengthy prison sentence.

Mr. Walton will stand before the court on September 9th and accept the Courts sentence for his actions. He will also be supported by his family who may be called upon to speak to his character. Mr. Walton's actions in the crimes laid out in this indictment are not an accurate portrayal of who is really is.

Mr. Walton offers this information not as an excuse, but simply as an explanation for his behavior. The Defense respectfully submits to the Court that the proposed sentence of 92 months is the appropriate disposition in this case. It is sufficient but no longer than necessary to further the sentencing goals of 3553 (a). We appreciate the Court's time and patience in reading this letter.

Very truly yours,

Mann & Risch, LLC


By: */s/ Tyler Mann*
      Tyler Mann

Enc.

CC: AUSA Christopher J. Romano (by electronic mail)