```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
 2                          NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4            Plaintiff,              )
          vs.                         )
 5                                    ) CRIMINAL NO.:
     CHE JARON DURBIN,                ) 1:20-cr-00210-GLR-2
 6                                    )
              Defendant.              )
 7   _____)

 8
                                      Baltimore, Maryland
 9                                    December 19, 2022
                                      9:30 a.m.
10
                           TRANSCRIPT OF PROCEEDINGS
11                            SENTENCING HEARING
               BEFORE THE HONORABLE GEORGE LEVI RUSSELL, III
12                             Courtroom 7A

13

14   For the Plaintiff:

15        Christopher J. Romano, Esquire
          Office of the United States Attorney
16        36 S. Charles Street, 4th Floor
          Baltimore, MD 21201
17

18   For the Defendant:

19
          Catherine Flynn, Esquire
20        Law Office of Catherine Flynn
          217 North Charles Street
21        2nd Floor
          Baltimore, MD 21201
22

23   Also Present:  Jessica Jackson, Probation Officer
                    Michael Pecukaitis, U.S. Postal Inspector
24

25        (Computer-aided transcription of stenotype notes)
```

<pre>
                          P R O C E E D I N G S
</pre>

     (9:30 a.m.)

          THE COURT:  You can have a seat everyone.  Good
morning.  Mr. Romano, why don't you call the case for me,
please.

          MR. ROMANO:  Thank you, Your Honor.  Good morning.
This is the matter of the United States versus Che Jaron
Durbin.  Representing the United States is Christopher Romano.
Also present at counsel table is U.S. Postal Inspector Michael
Pecukaitis, and we're here for Mr. Durbin's sentencing on
Counts 1, 2 and 3 of the Indictment after he was found guilty
at trial.

          THE COURT:  Very good.  Ms. Flynn, good morning to
you.

          MS. FLYNN:  Good morning, Your Honor.  I'm Catherine
Flynn; I represent Mr. Durbin who is seated to my left.

          THE COURT:  Mr. Durbin, good morning to you, sir.

          THE DEFENDANT:  Good morning.  How are you doing?

          THE COURT:  Pursuant to the court's masking policies,
everyone in the courtroom shall remain masked unless you're
engaged in a speaking role and have been fully vaccinated.  I
have been fully vaccinated, and I am engaged in a speaking
role, so as a result, I'm going to go ahead and remove my
mask.

          We are here for the purposes of sentencing.  Mr.

1   Durbin was convicted on three counts of Conspiracy to

2   Distribute and Possess with Intent to Distribute Cocaine after

3   a jury trial.

4           Mr. Durbin, have you had the opportunity to view the

5   presentence report that was generated in this case?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Mr. Durbin, if you could please sit up

8   and speak clearly into the microphone.  Have you had the

9   opportunity to speak with your attorney about the report?

10          THE DEFENDANT:  Briefly.

11          THE COURT:  I'm sorry?

12          THE DEFENDANT:  Yes, I spoke with her briefly about

13  it.

14          THE COURT:  Do you need more time to speak with her

15  about the report?

16          THE DEFENDANT:  I don't believe so.

17          THE COURT:  Ms. Flynn, have you had the opportunity

18  to review the report with your client?

19          MS. FLYNN:  Yes, Your Honor, and I believe I sent a

20  copy to Mr. Durbin.  Is that correct?

21          THE DEFENDANT:  Yes.

22          MS. FLYNN:  And we've had two or three visits since

23  then; is that correct?

24          THE DEFENDANT:  Yes.

25          MS. FLYNN:  All right.  I just wanted to clarify, we

1   have spoken several -- quite a few times since I sent it to you

2   because this sentencing actually originally was scheduled in

3   September, I believe.

4             THE COURT:  Right.

5             MS. FLYNN:  And we moved it to today's date because I

6   was on a jury.  So we've had several visits in between that

7   time; is that correct?

8             THE DEFENDANT:  Yes.

9             THE COURT:  Just to confirm, Mr. Durbin, you don't

10   need any additional time to review the presentence report with

11   your attorney?  You're satisfied with your review of it as well

12   as your consultation with Ms. Flynn regarding the presentence

13   report; is that correct, sir?

14             THE DEFENDANT:  I just have a few, like,

15   misunderstandings on a couple of the points that I received.

16             THE COURT:  All right.  Let me ask you this.  I have

17   received sentencing memoranda from both the Government as well

18   as Ms. Flynn, and I did receive a self-represented defendant's

19   pro se supplement to the sentencing memoranda which you ended

20   up filing dated December 7, 2022, ECF No. 200.  Is that what

21   you're referring to?

22             THE DEFENDANT:  Yes.

23             THE COURT:  And within the confines of that document,

24   I note that you contest several issues which would include a

25   two-level obstruction of justice enhancement because you assert

```
 1   that you did not obstruct justice by testifying falsely at

 2   trial.  Is that correct, sir?

 3              THE DEFENDANT:  Yes.

 4              THE COURT:  And do you contest you were an

 5   organizer/leader of the organization as well; is that correct?

 6              THE DEFENDANT:  Yes, I contest that too.

 7              THE COURT:  Okay.  Those two issues are the primary

 8   issues regarding the sentencing guidelines; is that correct,

 9   sir?

10              THE DEFENDANT:  Yes.

11              THE COURT:  And then, of course, you cite to a number

12   of factors related to your physical condition, your health

13   condition and other factors associated with the 3553(a) factors

14   in order to make an effort to have your sentence reduced; is

15   that correct, sir?

16              THE DEFENDANT:  Yes.

17              THE COURT:  In sum total, I've generalized the

18   contested issues as well as the arguments that you're seeking

19   to make as part of this sentencing; is that correct, sir?

20              THE DEFENDANT:  Yes.

21              THE COURT:  Ms. Flynn, I know that you've reviewed

22   his supplemental sentencing memoranda and I have reviewed yours

23   as well.  Are there any -- do you believe that the Court has

24   adequately summarized the defendant's contested issues related

25   to this case and the arguments he is making regarding his
```

1    sentence?

2              MS. FLYNN:  Yes, Your Honor.

3              THE COURT:  Very well.  Mr. Romano, I know you've

4    reviewed the sentencing memoranda as well.  Has the Court sort

5    of generally captured the arguments that the defendant has

6    made?

7              MR. ROMANO:  Your Honor, I believe that's

8    correct although there may be an issue with regard to drug

9    quantity because that does affect the base offense level.  I

10   addressed that in my sentencing memo, and I'll be happy to

11   speak at the appropriate time about that as well.

12             THE COURT:  Okay, very well.

13             MR. ROMANO:  Otherwise, yes, the Court fairly

14   summarized both Ms. Flynn's argument and the pro se arguments

15   that the defendant filed as well.  For the record, I did remove

16   my mask; I have been fully vaccinated and boosted.

17             THE COURT:  Thank you.  So I think the way we're

18   going to handle this is we're going to first start out with

19   the -- what the appropriate guidelines are in the case

20   according to the presentence report because those may be

21   contested.  Counts 1, 2 and 3 are grouped, and pursuant to

22   3D1.1, Group 1, conspiracy and possession with intent to

23   distribute cocaine, the base offense level is 30 due to the

24   amount and type of narcotics involved.  I believe the issues

25   were that he was charged with distribution of 5,000 grams of

cocaine as to Count 1 and then 500 grams of cocaine as to
Counts 2 and 3.

I'll certainly hear from the Government with regard
to the quantities indicated and to determine whether or not the
base offense level is appropriately 30.

MR. ROMANO:  Thank you, Your Honor.

THE COURT:  It's at least five kilograms of cocaine
associated with the defendant.

Then I'll hear from Ms. Flynn, and then we'll move to
each individual enhancement as well.

MR. ROMANO:  Your Honor, the Government's position is
that the base offense level with regard to Count 1 is at least
five kilograms of cocaine which would be a base offense level
of 30.  As the Court is familiar because you presided over the
trial, you heard testimony from a cooperating co-defendant,
Jameka Thompson, who testified that based on her multiple trips
between Tucson, Arizona and Harford County, Maryland, that she
transported upwards of 40 kilograms of cocaine.

Her testimony in large part was corroborated not just
by the quantity of drugs that were seized from her which was
over a kilo on the last stop, but as Your Honor will recall,
there were both airline records, hotel records, and rental car
records that showed a series of her trips from flying out from
Baltimore to Tucson and getting a rental car and driving back
where she indicated in her testimony that she was transporting

1    cocaine.  She used both her credit card as well as the

2    defendant's credit card to rent those rental cars.  We produced

3    those records which showed over 2,000 miles on each one of the

4    trips.  And clearly she was not out there just for the weather.

5    She was out there to transport cocaine back.

6           In addition to her testimony and her acknowledgment

7    at the time that she appeared before Your Honor and pled guilty

8    that she was involved in a conspiracy of over five kilograms,

9    Your Honor also heard the guilty plea of Mr. Durbin's source of

10   supply, Jack Anderson, who likewise accepted responsibility and

11   indicated that his role in the conspiracy was in excess of five

12   kilograms of cocaine.

13          Also as Your Honor will recall from the testimony --

14   and the postal inspector is here as well -- the U.S. Postal

15   Inspection Service seized $82,300 in currency, an amount that

16   the evidence showed was sufficient to pay for at least

17   four kilograms of cocaine.  All of that coupled with the one

18   kilogram of cocaine that was seized in 2019 from the

19   defendant's mother's residence, addressed to a company that the

20   defendant had formed and was the majority stockholder, TRU

21   Homes LLC, along with the excess of a kilogram that was seized

22   from Jameka Thompson in 2020, that there were at least five

23   kilograms of cocaine involved in the conspiracy.

24          Now the jury's verdict form indicated as to Count 1

25   that there was at least 500 grams or more of cocaine.  The

1   Court is not bound by that finding by the jury.  More than 25

2   years ago, as the Supreme Court pointed out in *United States v.*

3   *Watts*, a case that I cited in my sentencing memo, that even a

4   jury's verdict of acquittal -- and we don't have an acquittal

5   here; we have a finding by a jury of a drug quantity but we

6   don't have an acquittal.  But even a finding of acquittal, the

7   Supreme Court said does not prevent the sentencing court from

8   considering conduct that was involved in the charge as long as

9   the Court is satisfied by a preponderance of the evidence that

10  there was an amount in this case of five kilograms or more.

11         The Supreme Court in the *Watts* case relied upon the

12  statutory section of Title 18 §3661 which states that no

13  limitation shall be placed on the information concerning the

14  background, the character, or the conduct of the person

15  convicted of an offense for which the Court may receive and

16  consider for purposes of imposing the appropriate sentence; and

17  indeed that's echoed in the sentencing guidelines under §1B1.4

18  which says that the Court in determining the sentence to impose

19  within the guideline range or whether a departure is warranted,

20  that the Court may consider with that limitation any

21  information concerning the defendant's conduct unless otherwise

22  prohibited by law.  The Supreme Court has made clear that it's

23  not prohibited by law.

24         And indeed I'm not going to belabor the point

25  further, but I cited in my sentencing memo cases from the

1  Fourth Circuit, *U.S. v. Ibanaga* and *United States v. Hayes*, for

2  that very principle that the standard of proof here is by

3  preponderance of evidence in order for the Court to find that

4  the amount of cocaine involved in this conspiracy was five

5  kilograms or more.

6          Accordingly, I'm asking the Court to make a

7  determination that the base offense level would be a base

8  offense level of 30, reflecting at least five kilograms of

9  cocaine.

10          As far as Counts 2 and 3, he was only charged in

11  those counts with 500 grams or more, as Your Honor obviously

12  recalls at the time that both of those drugs were seized in

13  2019 and 2020.  In the one case it was a kilogram, and in the

14  2020 case when Jameka Thompson was arrested after the defendant

15  had gotten out from Tucson, had returned home, and she drove

16  back a couple days later, it was roughly 1.2 kilograms of

17  cocaine that were seized in connection with that.  And that

18  forms the basis for Counts 2 and 3.  But for Count 1, the

19  Government's position is that the overall arching conspiracy

20  reflected five kilograms or more which would be a base offense

21  level of 30.

22          So that's where we would start, and I'll address the

23  other issues once Ms. Flynn addresses this particular one.

24  Thank you, Your Honor.

25          THE COURT:  Thank you very much.  Ms. Flynn, I'll be

1    more than happy to hear from you.

2             MS. FLYNN:  Thank you, Your Honor.

3             I gather, Your Honor, I should identify for the

4    record that I have been fully vaccinated, and I've taken off my

5    mask for purposes of addressing the Court.

6             THE COURT:  Thank you.

7             MS. FLYNN:  Your Honor, we're asking the Court to

8    consider the base offense level to be 24 which I believe

9    accurately reflects the verdict from the jury.  Basically what

10   the Government is asking you to do is to ignore the fact that

11   the jury had the opportunity to convict Mr. Durbin of the

12   quantity that the Government was identifying and they chose not

13   to.  All of the evidence that was presented regarding the

14   quantity was speculative.  Let's start with Ms. Thompson's

15   testimony.

16            She speculated, she was estimating the quantity that

17   she believed she was responsible for.  She didn't identify that

18   "On every given trip this is how much I picked up, this is how

19   much money was involved."  She didn't testify with specificity

20   as to how she reached that number.

21            So the Government is asking Your Honor to basically

22   ignore the jury's verdict and go down that path of speculation

23   of what Mr. Durbin may or may not have been responsible for.

24   There was not any objective evidence, any tangible evidence of

25   the specific quantity here which I suspect is why the jury

1   rendered the verdict that they did.

2          So while I understand that the Court is allowed to

3   basically ignore the jury's verdict and their deliberation and

4   find by a preponderance of the evidence, in spite of the jury's

5   verdict, of certain quantity in this particular case, the

6   evidence that supports that argument is pure speculation.  So

7   the jury had the option of convicting him of more than five

8   kilograms; they chose not to.  They convicted him of possession

9   with intent to distribute 500 grams or more of cocaine, and I

10  believe that the proper designation of the base offense level

11  under those circumstances would be a 24.

12          So when the Government is arguing that you can take

13  into account Mr. Durbin's conduct, that was conduct that would

14  have been testified to by a cooperating co-conspirator who

15  received a significant benefit as a result of her testimony,

16  and the Government is also asking you to rely on a plea

17  agreement for a co-defendant who did not testify.  So we had no

18  opportunity to challenge the conclusions that were in the

19  statement of facts that he was asked to plead to.  So I don't

20  think it's appropriate for the Court to take into account

21  Mr. Anderson's plea agreement given the fact that there was no

22  opportunity to challenge that.

23          We did have an opportunity to challenge

24  Ms. Thompson's testimony and point out to the jury that she was

25  not a reliable witness, and I can only speculate that that's

1   why the jury reached the conclusion that they did.  While I

2   understand the Court is allowed to ignore the conclusion of the

3   jury, I don't believe under these circumstances that would be

4   appropriate.  In addition, obviously the Court did have an

5   opportunity to hear from Mr. Durbin, and the link between

6   Ms. Thompson's alleged activities and Mr. Durbin were basically

7   solely based on her testimony, and she received a significant

8   sentencing reduction as a result of that.

9          So it is our position that the proper base offense

10  level is a 24.

11         THE COURT:  Thank you.  Any reply from you,

12  Mr. Romano?

13         MR. ROMANO:  Just briefly, Your Honor.  We still have

14  the $82,300 which there was testimony from the Government's

15  witnesses, law enforcement officers, that that was back in that

16  time when that money was seized from the mailing by Mr. Durbin

17  to Jack Anderson out in Arizona, that that was basically the

18  going rate for four kilos of cocaine.  So it's not, with all

19  due respect to Ms. Flynn, it's not speculation.  She's

20  speculating as to why the jury returned the verdict that it

21  did.

22         But we're not asking the Court to speculate.  We're

23  asking the Court to look at the case in totality.  Also the

24  Court, just like we say to the jury, can rely on its own common

25  sense that Mr. Durbin, who flew out multiple times to Arizona,

1   and Ms. Thompson, who flew out to Arizona and then drove back,

2   wouldn't be driving back for an ounce, two ounces of cocaine.

3   That just defies credibility in terms of what was going on

4   here.

5           So we have her testimony.  In addition, we have the

6   multiple trips by her, as well as we have the airline records

7   and car rental records from Mr. Durbin going out there that

8   clearly show that there was an ongoing and a significant, a

9   significant effort to obtain cocaine to bring it back here to

10  Maryland.  So we have all that coupled with the money that I

11  think the Court can very well find by a preponderance of

12  evidence that it's not 500 grams.  I can speculate as to why

13  the jury came back with 500 grams because they saw one kilogram

14  and then they saw another kilogram.  They saw the one that was

15  concealed in that doll and then the other one.

16          So if I want to engage in the same type of

17  speculation as Ms. Flynn, the jury could very well have said,

18  okay, maybe they don't understand that for the conspiracy, it's

19  not just the drugs that were actually seized but what the

20  entire underlying conspiracy was involved in and what the

21  effort was.  But we don't need to speculate and we're not

22  asking the Court to speculate.

23          We're asking the Court to look at the evidence in

24  total, apply a preponderance of evidence, utilizing that

25  evidence as well as a finding by the Court with regard to just

1  common sense that you don't make those 2,000-mile trips back

2  multiple times.  We're not talking about one time, we're not

3  talking about two times.  The records show multiple trips to

4  establish that the object of this conspiracy was at least

5  five kilograms.  Thank you, Your Honor.

6          THE COURT:  Thank you very much.

7          Pending before the Court is a contested issue

8  regarding the amount and type of narcotics involved in a drug

9  conspiracy subsequent to the defendant's conviction despite the

10  jury verdict that they did indeed check the box under 500 grams

11  or more of cocaine.  The Court is convinced by a preponderance

12  of the evidence that the appropriate offense level is base

13  offense level of 30 pursuant to 2D1.1(a)(5) and (c)(5).

14          The collective evidence put forth at trial

15  demonstrates that as a result of seizures, transportation

16  records, credit card receipts, co-conspirator testimony, as

17  well as cash seized, that the defendant was involved in, at the

18  very least, five kilograms of cocaine and a conspiracy to

19  manufacture, import or possess with intent to distribute

20  cocaine in that particular quantity.  As a result, I will go

21  ahead and find that the base offense level is 30.

22          It appears that the next contested issue is whether

23  or not the defendant was an organizer or leader.  Mr. Romano,

24  if you'd like, I certainly can hear from you on that, but I

25  think your sentencing memoranda outlines that as well, but I'll

1    be more than happy to hear from you.

2          MR. ROMANO:  Thank you, Your Honor, just briefly.

3    The Government is requesting a four-level increase pursuant to

4    §3B1.1(a) that the defendant was an organizer or leader.  The

5    members of the conspiracy included, but weren't limited to, the

6    defendant; Jack Anderson; Jameka Thompson; Terrell Walton, the

7    co-defendant who went to trial; Gerrick Jackson, who the

8    wiretap calls between Mr. Durbin and Mr. Jackson showed

9    multiple, multiple contacts with Mr. Jackson ordering

10   quantities of cocaine and crack cocaine.  There were all these

11   references to scale and half time and all of that which weren't

12   for personal use.  They were for resale, given the amounts

13   requested, the frequency with the amounts requested.  So he was

14   clearly part and parcel of the conspiracy.  So there's five

15   people right there.

16          Then we have the other individuals that Mr. Durbin

17   was supplying, some of which was for personal use, some of

18   which was for resale.  So it's clear that he was an organizer

19   or leader.  He sent Jameka Thompson out there to Tucson to

20   obtain the cocaine and bring it back here so that it could be

21   resold.

22          In summary, the Government believes that the

23   defendant was, in fact, an organizer, a leader and a

24   resupplier, if you will, of the cocaine, and for those reasons,

25   the four-level increase is warranted.

1      THE COURT:  On top of that, he sent the package to

2  his mother's address.  I don't know whether or not she was

3  involved in the circumstance, but his mother's address was the

4  delivery destination for, I believe, the money.

5      MR. ROMANO:  Actually the mother's address was used

6  in two capacities.  One, the Court will recall he was hanging

7  outside waiting for the postal guy to show up, and when the

8  postal guy -- he actually almost ran to him to get that package

9  and bring it into mom's apartment there in Aberdeen; it was

10  addressed to TRU Homes, not to his mother.

11      THE COURT:  Right.

12      MR. ROMANO:  And, you know, I would hope that he

13  wouldn't intentionally make his mother part of the conspiracy,

14  but certainly he used that address to facilitate that.  And

15  then the money was actually mailed from him using, in this

16  case, his actual name and if you remember, the drugs when they

17  came out, Jack Anderson sent them in a fake name but about two

18  doors down from his house.  But when it came time for the

19  money, like a Jerry Maguire, "show me the money," they mailed

20  it to Jack Anderson, using Jack Anderson's real name and real

21  address.  Of course, notwithstanding both of those things had

22  gotten intercepted by the Postal Inspection Service so it never

23  made it to Jack Anderson.

24      But, yes, it just goes to show the lengths at which

25  he went to try and obtain the cocaine.  Once it got here, the

1   distribution levels through Terrell Walton and Gerrick Jackson

2   and others.  So I think there's ample, ample evidence to

3   support the four-level increase for the role in the offense.

4   Thank you.

5          THE COURT:  Thank you.  Ms. Flynn, I'll hear from you

6   if you'd like.

7          MS. FLYNN:  Your Honor, frankly, my argument is going

8   to dovetail with the anticipated Government's request for the

9   two-level increase for obstruction of justice because I'm

10  relying on Mr. Durbin's testimony in making my argument.

11         THE COURT:  Understood.

12         MS. FLYNN:  The two go hand in hand.

13         THE COURT:  And then I'll just give Mr. Romano a

14  brief opportunity to reply to both, and then I'll rule on

15  both.

16         MS. FLYNN:  All right.  Your Honor, we would object

17  to -- I'm jumping forward.  We would object to the four-level

18  enhancement for the role in the offense as well as the

19  two-level enhancement for the allegation of obstruction of

20  justice.  Your Honor heard obviously the entire trial.  You

21  heard Mr. Durbin's testimony.  He explained that he was not

22  involved in this conspiracy, that he was involved in selling

23  marijuana and that he was involved in the illegal sale of

24  vehicles, getting them from the Southwest, that the vehicles

25  were sold across the border; that when they raided his house,

1  there was documentation of false vehicle titles, all sorts of

2  documentation that indicated that there was this, I guess,

3  illegal sale of car activity.

4       He testified that that's what he was involved with;

5  that the activities of Jameka Thompson and Jack Anderson, while

6  Mr. Durbin had introduced them, he didn't have anything to do

7  with the ongoing activities that those people were involved

8  with and that his phone calls and the connections to these

9  other alleged co-conspirators, he indicated that he was selling

10  marijuana, not cocaine.  So he denies the allegations in this

11  case and he denies that his testimony was untruthful.

12       THE COURT:  Right, okay.

13       MS. FLYNN:  So I would object to both enhancements.

14       THE COURT:  Very good.  Mr. Romano, I'll hear from

15  you if you like.

16       MR. ROMANO:  Thank you, Your Honor.  Your Honor, the

17  Government is seeking under sentencing guideline §3C1.1 a

18  two-level enhancement for obstruction.  That section under

19  3C1.1 provides that if a defendant willfully obstructed,

20  impeded or attempted to obstruct or impede the administration

21  of justice with respect to an investigation, prosecution or

22  sentencing, then the Court may very well include a two-level

23  enhancement for obstruction.

24       While the Government understands the defendant has a

25  constitutional right to testify in his defense, he doesn't have

1    a constitutional right to "test-i-lie" and that's what he did

2    here.  He took the stand and said, "I'm not trafficking in

3    cocaine; I'm trafficking in marijuana."  No evidence of

4    marijuana, no evidence of marijuana being seized.  What came to

5    Mom's house wasn't marijuana; it was cocaine.  What Jameka

6    Thompson brought back -- and let's again look at that scenario

7    in May of 2020.

8            He flies out there, she flies out there.  We see them

9    both on the surveillance.  She's meeting with Jack Anderson.

10   He's picking her up at the airport and bringing her to Jack

11   Anderson.  She starts to leave in one vehicle, comes back,

12   meets again with Jack Anderson, obtains more cocaine and drives

13   back.  The defendant says, "Well, that was between Jack

14   Anderson and Jameka Thompson."  Jameka Thompson had no record

15   until --

16           THE COURT:  She had a job, she had a place.  She had

17   a family to support.

18           MR. ROMANO:  Right.  She got kicked off a post.

19           THE COURT:  She lost everything.

20           MR. ROMANO:  She did and the reason she did was -- if

21   you'll recall too she was even, after she was arrested and she

22   was in Harford County -- and this kind of goes towards the

23   sentencing issues that I'll touch on in a minute -- she's told

24   not to have contact with him.  She's already out, they released

25   her, and she's still calling him while he's locked up in the

1    Harford County Detention Center.  So she gets yanked back in

2    the detention center because she's in violation of her pretrial

3    conditions.  Even when she's in there, she's still trying to

4    call him.  Why?  Because, as she said, she loved him.

5            THE COURT:  There was this whole scheme to get

6    married.

7            MR. ROMANO:  Oh, yeah.  They were going to get

8    married.  For reasons we don't need to go into, that didn't

9    happen.  But the defendant used her.  He used her to facilitate

10   his drug business.  Whether he really had feelings for her or

11   not doesn't matter.  What he did do is he involved a woman who

12   had no prior criminal record to do his dirty work.

13           As Your Honor indicated, she lost everything.  She

14   had a master's degree.  In fact, Ms. Flynn was trying to

15   cross-examine her that she was the brains behind the outfit

16   here because she had the master's degree, and she was the one

17   with Jack Anderson that was doing all of this.  And the

18   defendant, "Oh, okay, yeah, I was selling some stolen cars."

19   But that's not the basis to say that his testimony doesn't

20   result in an obstruction enhancement.

21           Indeed, the Supreme Court in the *United States v.*

22   *Dunnigan* stated that the defendant can't contend in the

23   sentencing that because perjury interferes with the right to

24   testify, that we shouldn't apply that if the facts are such

25   that that testimony is, as I said, really "test-i-lie."

1          There's a case that's exactly on point that I cited

2     in my sentencing memorandum, *United States v. Perez*, where in

3     that case the obstruction of justice enhancement was affirmed,

4     affirmed for a defendant who falsely testified under oath that

5     he wasn't involved in cocaine trafficking.  That testimony

6     directly is contradicted by not only just a Government's

7     witness that the jury found credible, regardless of what we're

8     talking about in terms of drug quantity, but the jury obviously

9     found that testimony credible.  And the Court in *Perez* found,

10    as this Court should, that that false testimony concerned a

11    material matter, namely the guilt or innocence of the

12    defendant.  His false testimony that he wasn't involved in a

13    cocaine conspiracy or the money that he was sending to the

14    source of supply were not drug proceeds were absolutely

15    material to the guilt or innocence.

16          And it was done willfully.  It wasn't by accident.

17    It wasn't by mistake.  In fact, he got on the stand and said,

18    "I wouldn't get involved in cocaine this time because I already

19    got banged on that once, so I know what I was looking at there.

20    So that's why I was only selling marijuana."

21          Now did we see a single ounce, much less a single

22    gram of marijuana recovered from Jameka Thompson, from Mom's

23    house, from the package, from the searches that were done at

24    the defendant's house where we got the stolen car titles or

25    whatever they were?  No.  Now the fact that he may have been

1    involved in other criminal activity is hardly shocking or

2    surprising so if he's involved in a stolen car ring, fine.  So

3    what?  That wasn't why he was flying out to Arizona.  Jameka

4    Thompson wasn't driving stolen cars back and forth.  She was

5    driving cocaine back so it could be resold.

6             He clearly testified intentionally, willfully and

7    falsely as to material matters, and for those reasons, the

8    obstruction enhancement should apply as well.  Thank you.

9             THE COURT:  All right.  Pending before the Court are

10   two requests or two objections to the presentence report,

11   namely that the defendant was an organizer/leader pursuant to

12   3B1.1(a), as well as the defendant obstructed justice by

13   testifying falsely about his narcotics distribution activities,

14   namely that he was distributing marijuana and also engaged in

15   the transportation and distribution of stolen vehicles.

16            The Court does find by a preponderance of the

17   evidence the defendant was clearly an organizer/leader.  He

18   manipulated others within the criminal conspiracy.  The

19   evidence demonstrated that he was certainly in charge of the

20   location of where the narcotics would be distributed to.

21   Ms. Thompson testified credibly that she was directed by the

22   defendant.  Again, credit card records and other financial

23   documents indicate that he was an organizer/leader.

24            Further, the defendant's own testimony this Court

25   finds by a preponderance of the evidence was false.  There was

no indication, as pointed out by the Government, of the seizure

of any marijuana.  In fact, the circumstances regarding this

particular conspiracy and the evidence against the defendant

supports that he was indeed engaged in the cocaine distribution

activities.

So there's just no question based upon the evidence

as a whole -- and in fact, the jury disbelieved the

defendant -- that he was an organizer/leader, and of course he

testified falsely because the credible evidence in this case

pointed to him distributing cocaine and being involved in the

drug conspiracy.  As a result, both enhancements will end up

applying; that will raise his base offense level to 36.

I'll ask Ms. Flynn, those were the -- those were the

objections that were addressed by the defendant?  In other

words, he does not address or object to any term or condition

of supervised release, fine, et cetera, as indicated in the

presentence report; is that correct?

MS. FLYNN:  Yes, Your Honor.

THE COURT:  All right.  Looking at the defendant's

criminal history, he's accumulated a total of 12 criminal

history category points.  He was on probation at the time that

he committed the present criminal offense.  Among those

previous criminal convictions is a previous federal conviction

for cocaine base in which he received a reduced sentence of 20

months.  As a result, he has 14 criminal history category

1  points.  He is well within the Roman numeral VI category.  That

2  puts him -- with the grouping, it puts him at an offense level

3  36, criminal history category VI, with a guideline range of

4  between 324 and 405 months.

5          There is a minimum mandatory sentence that comes

6  along with these convictions on all three counts of five years;

7  a supervised release range as to Count 1 and 2 and 3 of between

8  four and five years; a fine range of between 40,000 and $5

9  million; and a special assessment of $300, $100 for each count

10  of conviction.

11          Mr. Romano, is that an accurate characterization of

12  the sentencing guideline range?

13          MR. ROMANO:  Yes, it is, Your Honor.

14          THE COURT:  Ms. Flynn, understanding and noting

15  Mr. Durbin's objections to the Court's finding, that is an

16  accurate characterization of the Court's finding of the

17  guideline range?

18          MS. FLYNN:  Yes, Your Honor.

19      **(Conference at the bench.)**

20      **(It is the policy of this court that every guilty plea and**

21  **sentencing proceeding include a bench conference concerning**

22  **whether the defendant is or is not cooperating.)**

23          THE COURT:  All right.  Mr. Romano, I'd be more than

24  happy to hear from you regarding sentencing.

25          MR. ROMANO:  Thank you, Your Honor.  As we all know,

1   the advisory guideline range is but one factor that the Court
2   is to consider in fashioning the appropriate sentence.
3   Title 18, § 3553(a) sets forth the factors that the courts are
4   to consider, including the nature and circumstances of the
5   offense, the history of the defendant, the need for the
6   sentence to be imposed to reflect the seriousness of the
7   offense, to promote respect for the law, and to provide just
8   punishment as well as to afford an adequate deterrent to the
9   defendant and, significantly here as well, to protect the
10  public from further crimes of the defendant.
11          The Court is familiar with the entire case and
12  indeed, as I mentioned before, Mr. Durbin not only involved
13  himself but involved Jameka Thompson, an individual who had no
14  prior criminal involvement and criminal history until her
15  unfortunate association with Mr. Durbin.
16          As the report reflects, Mr. Durbin has four prior
17  felony convictions.  The Court has touched upon one of those
18  which is a federal conviction for which he had initially
19  received 140 months, later reduced to 120 months.  There were
20  repeated violations of conditions of that supervised release
21  which resulted in an additional cumulative total of three
22  years' incarceration for those violations.
23          It's pretty clear that Mr. Durbin has shown and
24  remains undeterred when it comes to drug trafficking.  He has
25  no real credible argument that he's not a recidivist drug

 1  dealer.  And the Court needs to impose a sentence, if not to

 2  deter Mr. Durbin from further criminal conduct, but at a

 3  minimum to protect the public from Mr. Durbin's criminal

 4  activities.

 5        I'm reminded of a quote from Winston Churchill who

 6  said:  The most exhilarating feeling in the world is being shot

 7  at and missed.  Initially Mr. Durbin was shot at and hit when

 8  he got that federal conviction, but it didn't deter him.  He

 9  was, in essence, shot at and missed when in 2019 that package

10  of cocaine was sent to his mother's house.  It was seized; he

11  wasn't prosecuted for that.  You would think that, giving

12  credit to his testimony on the witness stand, that he knew what

13  kind of sentence he could be facing given that he had

14  previously been convicted of cocaine.  It didn't draw him up

15  short because he got that package in 2019.  And even after that

16  when he knew that he was being looked at because they seized

17  those drugs, he continued.  He continued to deal in cocaine.

18        "Well, I can't have it mailed to me because I see

19  what happened there, so plan B, send Jameka out to Tucson and

20  we'll just drive the drugs back.  We'll just drive them back."

21  Money up to that point hadn't been a problem so, "I'll mail the

22  money out, but I'm not going to mail drugs back to me because

23  that had already been picked off."  The only thing that did

24  when that first package in 2019 was seized, it didn't stop him;

25  it just changed up the MO.  How is he going to get the drugs

back to Maryland, and how is he going to get the money back out
to Jack Anderson?  So it didn't stop him.

In every sense of the word, Che Durbin is a career
offender.  He has four prior felony drug convictions.  He has
now facing him a sentence for a fifth and what amounts to his
second federal drug conviction.  He hasn't been deterred.
Quite frankly, I don't know that there's anything that will
deter.  So we then have to look at how do we protect the
public?  How do we promote respect for the law?  Two important
considerations under Title 18, 3553(a).

In my sentencing memorandum, I asked the Court to
consider a sentence that's higher than what I'm actually going
to recommend now.  I will say this -- and as the Court knows
and I'm sure is going to hear from Ms. Flynn, perhaps members
in the courtroom and perhaps even Mr. Durbin himself, he did
sustain a serious injury.  There's no question about that.  At
the hands of his co-defendant, an extremely violent
individual.

THE COURT:  That's cost him -- Mr. Durbin's
recidivist behavior has cost him more than just time away from
his family and behind bars.  It's now costing him his eye.
That's another cost of this is that he's missing an eye because
he decided he didn't learn from the previous drug convictions
and wanted to continue to engage in this behavior.  He's ruined
Ms. Thompson's life.  He's now lost an eye and regardless of

1    what happens is going to be spending a significant amount of

2    time in the Bureau of Prisons.

3            MR. ROMANO:  Correct.  In that regard, it's -- I

4    don't want to have the Court take this the wrong way, but I

5    think the Court understands -- but for his activities, he

6    wouldn't have placed himself in the position at least the way

7    he lost his eye.

8            THE COURT:  Absolutely.

9            MR. ROMANO:  He could have lost his life, quite

10   frankly, the way he was operating out on the street.  But the

11   fact that he did sustain a serious injury at the hands of his

12   co-defendant, quite frankly, tempers my recommendation.  As I

13   indicated, initially I was going to recommend 325 months which

14   is about 27 and a half years.  But I do think a substantial

15   sentence needs to be imposed.  I'm going to ask the Court to

16   consider a sentence at least 20 years or 240 months.  That's

17   double what he got the last time.  Clearly the last time, even

18   coupled with the reduction from 140 down to 120 and then three

19   years on top of that that he got for the violation of

20   supervised release, didn't slow him down, didn't deter him.  So

21   the Court needs to consider all of that when it reflects on

22   what's the appropriate sentence that's sufficient but not

23   greater than necessary.

24           The guideline range, 325 to 400-some months, given

25   his personal circumstances, which I think the Court also needs

1    to take into consideration from the physical standpoint, I

2    think warrants a reduction in what the Government was seeking

3    and call it lenity, call it whatever, I believe that a sentence

4    of 240 months or 20 years is the appropriate sentence given his

5    prior multiple felony drug convictions, his repeated violations

6    of both state probation and federal supervised release, and the

7    fact that he continues and continues and continues to deal in

8    drugs which the Court knows not only ruined people's lives but,

9    in fact, can cost people their lives.

10           So for all those reasons, Your Honor, I would

11   respectfully ask the Court to consider a sentence of at least

12   20 years.  Thank you.

13           THE COURT:  Thank you very much.  Ms. Flynn, I'll be

14   more than happy to hear from you.

15           MS. FLYNN:  Thank you, Your Honor.  I know the Court

16   is well aware of my client's medical issues.  He had two --

17   well, three significant medical problems while he was

18   incarcerated.  First, he was diagnosed with COVID and that was

19   prior to getting vaccinated, and he now permanently suffers

20   from hypertension as a result of that.  He was diagnosed with

21   COVID on November 30, 2021.  He was locked up on May 12, 2020

22   in Harford County, so he's been continuously incarcerated since

23   that date.

24           THE COURT:  No objection to credit since May 12 of

25   2020?

1          MR. ROMANO:  No, sir.

2          THE COURT:  All right.

3          MS. FLYNN:  Then on May 15, 2021, he tore his

4     Achilles tendon while at CDF.  It's not just that he suffered

5     this injury; it was the lack of proper medical care that

6     exacerbated the problem.  I had to file two motions with the

7     court to get the proper medical care for Mr. Durbin.  I had to

8     file a motion in June asking for an MRI which had been

9     recommended but the jail wasn't accommodating, and then a

10    further motion was filed in November for follow-up treatment.

11    So it's not just the injury, but it's the way somebody is

12    treated when they're at CDF.  And it's my understanding,

13    speaking to Dr. Berger who's the surgeon for the Achilles

14    tendon, that the delay in treatment, the delay in getting

15    proper medical care exacerbated the problem.

16          I'm not sure if the Court remembers this, but when we

17    were in trial, Mr. Durbin was coming in but he had a boot on.

18          THE COURT:  Right.

19          MS. FLYNN:  And it's my understanding that as a

20    result of that, an infection developed and that was probably in

21    February or March, and then he suffered from that infection for

22    months.

23          Ultimately what ended up happening, he was stabbed on

24    April 11, 2022, stabbed in the eye.  He indicates to me that

25    there was a delay in calling the ambulance, there was a delay

 1    in getting to the hospital.  And he was at the hospital at MTC

 2    for a while after he was released from the University of

 3    Maryland, but it was torture trying to get the proper medical

 4    treatment from outside eye experts.

 5          What ended up happening is that Dr. Berger, who was

 6    the doctor for his Achilles tendon, had to delay access to

 7    handle what he needed to handle for Mr. Durbin because of the

 8    eye surgery and the schedule there.  So he had to take a back

 9    seat to the schedule of the eye surgeons.  I think there were

10    two surgeons who had to perform the surgery on Mr. Durbin.  And

11    that, I think, was in September; is that correct, sir?

12          THE DEFENDANT:  Yes.

13          MS. FLYNN:  So the injury was in April and he didn't

14    get surgery until September.  And then there were five

15    follow-up appointments, and Dr. Berger said to me, I can't do

16    anything until after all of that has been completed.  So the

17    infection had been festering for months.  What Dr. Berger

18    indicated is he's going to have to have another surgery because

19    of all these delays.

20          So ultimately I am going to be asking the Court to

21    recommend to the Bureau of Prisons that he be sent to -- I

22    think it's Butner, North Carolina?

23          THE COURT:  Butner, right.

24          MS. FLYNN:  Which it's my understanding they have

25    medical facilities.

1            THE COURT:  Absolutely.  It's probably the best

2    medical facility that the Bureau of Prisons has so

3    definitely --

4            MS. FLYNN:  So that is going to be a request because

5    there is ongoing treatment and intervention that's going to be

6    necessary.  Hopefully, there will come a point where whatever

7    intervention is necessary when it's over and they can get him

8    to the best place they can and that he get that and be

9    transferred to another facility.  I don't know that it's going

10   to be a chronic problem.  It's just that there are problems

11   that have to be addressed, and the delay because of his

12   incarceration have made things much, much worse than they would

13   have been for somebody who was not incarcerated at the time of

14   the injuries.

15           So while I understand the Government and the Court

16   have indicated but for his activities, he wouldn't have been

17   locked up where he got these injuries, that still doesn't mean

18   he should be entitled to subpar medical treatment.

19           THE COURT:  I 100 percent agree.  And as I'm certain

20   you're aware, and the Government is aware and the Marshal

21   Service and everyone, this circumstance related to COVID threw

22   everything completely upside down.

23           MS. FLYNN:  I know.

24           THE COURT:  And it got to a point where even after

25   the vaccine became available, there were some people that

```
1   weren't taking it, you were still getting it even though you
2   were vaccinated.  There was a high risk of contracting this
3   virus.  And that basically backed up not only the courts but
4   backed up the medical services provided to inmates, backed up
5   just general elective services that everyday folks were getting
6   before the pandemic.  But I agree with you and your point is
7   well taken that although the circumstances that gave rise to
8   him being incarcerated aren't necessarily on the government,
9   nevertheless the treatment after he is incarcerated, there is
10  some responsibility and accountability on the government's
11  part, so I hear you.
12         MS. FLYNN:  Thank you.  Before I finish, I know one
13  member that's in the audience of my client's family would like
14  to address the Court.
15         THE COURT:  Sure.  Who is that?
16         MS. FLYNN:  Ms. Tracy Durbin.
17         THE COURT:  Ms. Durbin, why don't you come forward.
18  You can come here through the double doors.  Ms. Flynn, if you
19  could direct her to the podium.  Ms. Durbin, if you have been
20  fully vaccinated, you may remove your mask when speaking.
21         MS. MURRAY:  I'm Tracy Murray.  I'm vaxxed and
22  boosted.
23         THE COURT:  Fantastic.  If you could, please state
24  and spell your full name for the record.
25         MS. MURRAY:  Tracy Murray, T-r-a-c-y M-u-r-r-a-y.
```

1    THE COURT:  All right, Ms. Murray, I'll be more than

2  happy to hear from you.

3    MS. FLYNN:  Before you start, I just want the Court

4  to have some context.  Mr. Durbin was very, very lucky to have

5  Ms. Murray as his advocate for his healthcare issues.

6    THE COURT:  Good.

7    MS. FLYNN:  I think but for Ms. Murray, we might

8  never have been able to get the proper care because she is in

9  the healthcare industry, and she was very, very aggressive in

10  her advocacy on behalf of Mr. Durbin to get the proper medical

11  care.  So I just want the Court to be aware of that.

12    THE COURT:  Ms. Murray, thank you very much for your

13  efforts.  You didn't have to do it.  You're in this business

14  but I appreciate your efforts.

15    MS. MURRAY:  I am Mr. Durbin's girlfriend.  I've been

16  his girlfriend for 14 years.  I am a registered nurse, I have

17  my bachelor's degree.  I just want to reiterate what Ms. Flynn

18  said about the medical treatment that he received.  First he

19  caught COVID.  Subsequently, now he has hypertension which he

20  did not have.  He lost his eye for them not calling 911 when he

21  needed; he sat there and bled out for over an hour which

22  subsequently caused him to be blind.

23    THE COURT:  It initially started when he was stabbed

24  in the eye by his co-defendant.

25    MS. FLYNN:  Yes, that is correct, while he was on the

telephone with me.  He sat there for over an hour waiting for

medical treatment.  He did not get medical treatment then.

The leg issue, it happened maybe in May.  Sent

letters, called, had to speak with Ms. Flynn in order to get

the proper treatment that he needed then.  Subsequently it got

infected.  He could also lose his leg at this point because he

has to have another surgery because of that.

As you said, if he weren't here, this probably would

have never happened, but that does not mean that he does not

deserve the treatment that he should have gotten.  He just

didn't deserve none of that.

THE COURT:  I understand.  I want to again thank you

for your strength and advocacy for Mr. Durbin, your dedication

to being a healer and coordinating efforts with Ms. Flynn, who

is one of our outstanding Criminal Justice Act panel attorneys,

to be able to do everything you can to advocate for him.  So

thank you.

MS. MURRAY:  No problem.  You're welcome.

MS. FLYNN:  Thank you, Your Honor.  Here in the

courtroom I just want to point out in addition to Ms. Murray

are her three daughters who Mr. Durbin helped raise, as well as

my client's father, cousin, and brother-in-law.

THE COURT:  Okay, thank you very much.  I'm sorry

you're here under these very difficult circumstances.

MS. FLYNN:  So he does have a lot of support in the

1   community.  One other thing, it is my recollection that after

2   my client was stabbed by Mr. Walton, I let Mr. Romano know that

3   that happened.  The jail didn't even let the Government know

4   that that had happened.  And Mr. Romano was in a position of

5   scrambling to try and backtrack and get the information.

6           I think by the time he was made aware of it -- he can

7   correct me if I am wrong -- whatever video there was was not

8   secured, and therefore Mr. Walton was not, in my opinion,

9   properly -- I don't know that the case was properly

10  investigated for purposes of prosecution.  I think there was

11  video, and it was not secured and stored.

12          THE COURT:  I believe it was also an issue of

13  Mr. Durbin not being cooperative as well.

14          MS. FLYNN:  I understand that.

15          THE COURT:  So Mr. Durbin knows who stabbed him, and

16  he chose not to assist in the investigation and prosecution of

17  a person who took his eye.

18          MS. FLYNN:  Your Honor, I understand that.

19          THE COURT:  So that's on him.

20          MS. FLYNN:  But it's also objectively the -- if

21  there's video and a crime occurs, I think it's incumbent upon

22  the law enforcement community to secure that video.

23          THE COURT:  Right.  And also Mr. Durbin testifying

24  and corroborating his co-defendant doing what he did goes a

25  long way to securing a conviction.

1          MS. FLYNN:  I understand.

2          THE COURT:  Understood.

3          MS. FLYNN:  Just factually speaking, I was surprised

4    when I contacted Mr. Romano and he was unaware of it.

5          THE COURT:  Sure.

6          MS. FLYNN:  Frankly, I don't know what all the rules

7    of this kind of process are, but Mr. Romano was certainly

8    advised very quickly when Ms. Thompson was trying to marry my

9    client.  He was the one who told me about that.  But

10   unfortunately, I was the one who had to inform him about the

11   injury.  I just want the Court to be aware that these things

12   can be complicated.

13         I'm asking Your Honor to consider a sentence of 15

14   years which is 180 months given the significant cost to

15   Mr. Durbin's health as a result of his incarceration.  My

16   understanding is Mr. Walton received 13 years, if I'm not

17   mistaken, and it is my understanding that part of that included

18   his conduct that -- as alleged in being the perpetrator against

19   Mr. Durbin.  So it's my understanding, while I wasn't present

20   for the entire sentencing, that the Court was taking into

21   account Mr. Walton's role in what happened to Mr. Durbin in

22   fashioning a sentence under the circumstances in his case.

23         I understand the verdicts and the counts were

24   different for Mr. Walton, and obviously I can't speak to his

25   criminal history.  But as far as Mr. Durbin is concerned, I'm

1    asking Your Honor to consider a sentence of 180 months under

2    all of the circumstances.

3          Now, Mr. Durbin, you have a right of allocation in

4    this case.  You can address the Court if there's something that

5    has not been addressed, or you can remain silent.  That's up to

6    you.  Is there something you would like to say?

7          THE DEFENDANT:  Yes.  First I want to say -- [noise

8    interruption.]

9          THE COURT:  You have to move away from the

10   microphone.  If you've been fully vaccinated, you can pull down

11   your mask, Mr. Durbin.

12         THE DEFENDANT:  Yeah.  First I want to apologize to

13   my family for the effect my decision-making made on them.  And

14   I want to send a special thank you to my fiancée, Tracy Murray,

15   for her encouragement and, you know, and just keeping me

16   positive throughout all this.  And I want to apologize to the

17   courts.

18         THE COURT:  All right.  I want to thank you very much

19   for that, Mr. Durbin.

20         Applying the 3553(a) factors, the defendant accepted

21   responsibility for his conduct.  He is 43 years old.  He does

22   have his GED.  He doesn't have any dependents, but his

23   girlfriend has children who she is raising.  Based upon the

24   presentence report, he had a normal childhood, no abuse or

25   neglect.  He is married and divorced.  In very poor -- I would

1  say poor physical health, having suffered significant injuries

2  as a result of altercations while incarcerated which included a

3  stabbing, leaving him blind in one eye.

4  I note that he has had extensive contact with the

5  criminal justice system and indeed received a more lenient

6  sentence as a result of his last federal drug conviction.

7  Despite being released, he was not deterred from engaging in

8  narcotics activity and indeed had another state court

9  conviction for drug distribution.  And then we, of course,

10  we've got this large-scale conspiracy.

11  Without a doubt, Mr. Durbin is an experienced drug

12  dealer and who, despite being incarcerated for significant

13  periods of time, has not been deterred from engaging in this

14  kind of criminal conduct.  It's also a demonstration of a

15  failure to appreciate the real damage that drug dealers do in

16  our community and, quite frankly, not learning his lesson from

17  it.  And people are sick of it.

18  He was an organizer and a leader of a large-scale

19  drug conspiracy.  He knew what he was doing.  In the wake of

20  his behavior, he ruined the life of a person who didn't have

21  any criminal record, namely his paramour or girlfriend.

22  Of course, it's very serious.  Much of the violence

23  and death that occurs in this country arises out of the illegal

24  narcotic drug trade.  In addition to that, it's noteworthy that

25  despite testifying falsely that he was not engaged in cocaine

distribution, he nevertheless admitted to being engaged in
interstate or international automobile -- stolen automobile
trafficking and readily admitted on the stand, despite
admonishments from the Court about his right against
self-incrimination, to still nevertheless engaging in drug
distribution.  I find it absolutely remarkable.

          And I certainly understand the circumstances giving
rise to his loss of an eye, and the lack of treatment or the
slow treatment should not have happened.  But nevertheless, the
perpetrator of this event wasn't brought to justice because
Mr. Durbin decided he wasn't going to snitch or cooperate
against somebody who ended up stabbing him in his eye.

          I do think that there's a need to protect the public.
His prior criminal behavior is a clear demonstration that he is
incapable as an adult of conforming himself to the laws of
society.  He did receive a reduced sentence of 10 years before.
The advisory guideline range is between 324 and 405 months.
There's a minimum mandatory as to each one of those counts,
Counts 1 and 3.  Supervised release range between -- as to
Counts 1 and 3 of four to five years, a fine range between
40,000 and $5 million, and a special assessment in the amount
of $100 for each count of conviction for a total of $300.

          I agree with the Government.  The sentence that is
sufficient, but not greater than necessary, to comply with the
purposes set out in 3553(a)(2) is 240 months.  I will tell you

1    before I heard argument in this case, I was seriously

2    considering going high into the guideline range, but I

3    certainly understand some leniency should be put in place given

4    the conditions of confinement that Mr. Durbin had to endure.

5            It will be 240 months for each count of conviction to

6    run concurrently, five years of supervised release to run

7    concurrently.  I note that I would have reached this sentence

8    regardless of how I fell on the guideline range based upon all

9    of the factors that I mentioned, including the fact that this

10   is the defendant's second federal criminal conviction and, I

11   believe, fourth or fifth distribution conviction.

12           I'm not going to impose a fine because he doesn't

13   have the ability to pay.  Restitution is not applicable.  There

14   is a forfeiture order here, the $82,300, the monies that were

15   seized.  Is there any objection to that?

16           MS. FLYNN:  No, Your Honor.

17           THE COURT:  Noted and granted.  There will be a

18   special assessment in the amount of $300 that will be imposed.

19   I am going to recommend a Bureau of Prisons facility in Butner.

20           The sentence doesn't fall within the guideline range.

21   In fact, it's well below the guideline range, but I think it's

22   nonetheless appropriate in light of the Court's findings on the

23   3553(a) factors and purposes.  There are no open counts to be

24   dismissed.

25           Mr. Durbin, you've got 14 days to file an appeal of

1    your conviction and sentence in this matter.  The defendant

2    will remain detained.  A Judgment and Commitment Order will be

3    prepared, a Statement of Reasons will be prepared, and these

4    records, along with the appropriate records of sentencing, will

5    be filed with the United States Sentencing Commission as well

6    as the United States Bureau of Prisons.

7            Mr. Romano, is there anything else we can

8    productively handle before we conclude?

9            MR. ROMANO:  Your Honor, you may have discussed it

10   and I may have not heard it, but I think now don't we have to

11   go through all the conditions of supervised release?

12           THE COURT:  Right.  Well, Mr. Durbin indicated

13   earlier, and I can confirm now, that he reviewed the

14   presentence report.  Is that correct, Mr. Durbin?

15           THE DEFENDANT:  Yes.

16           THE COURT:  And you had the opportunity to read both

17   the mandatory and standard conditions of supervised release?

18           THE DEFENDANT:  Yes.

19           THE COURT:  I also note that there's no objection to

20   the special conditions of supervised release which I did not

21   mention.  In addition to the standard and mandatory conditions

22   of supervised release, I am going to impose special conditions

23   which would include, of course, paying the special assessment,

24   to submit to substance abuse testing to determine if you've

25   used a prohibited substance, or not attempt to obstruct or

1    tamper with testing methods.

2          You must participate in a substance abuse treatment

3    program and follow the rules and regulations of that program.

4    The probation officer will supervise your participation in the

5    program: provider, location, modality, duration, intensity, et

6    cetera.

7          Ms. Flynn, I can recommend a residential drug

8    treatment program for him.

9          MS. FLYNN:  Thank you, Your Honor.

10         THE COURT:  Is there any other particular program he

11   would like to engage in, vocational training or something?

12         MS. FLYNN:  No, Your Honor.

13         THE COURT:  All right.  Is there anything else,

14   Ms. Flynn?

15         MS. FLYNN:  No, Your Honor.  I will be filing the

16   notice of appeal.  I will not be in a position to handle that

17   matter for him.

18         THE COURT:  Right.

19         MS. FLYNN:  So I've already indicated that he should

20   either reach out to the public defender's office for the

21   appointment of an appellate attorney or seek other private

22   counsel for purposes of the appeal.

23         THE COURT:  That's right.  Mr. Durbin, it's going to

24   be really important.  Ms. Flynn is moving on, and so she will

25   not be available to represent you during the course of the

1    appeal.  So it's going to be really important for you to reach

2    out to the public defender's office as soon as possible.  I

3    don't know whether or not Ms. Murray will do that or you can

4    coordinate --

5             MS. FLYNN:  I'll facilitate it.

6             THE COURT:  Okay.  Ms. Flynn is going to facilitate

7    the contact, so she can assist in getting you another federal

8    public defender for the purpose of appealing your conviction.

9             THE DEFENDANT:  So do I put something in writing?

10            THE COURT:  She'll explain it to you.  She's one of

11   our outstanding panel attorneys, and so she will be able to

12   explain everything to you, and she will facilitate reaching out

13   to the public defender's office for the purpose of getting you

14   counsel.  And, by the way, everything is being recorded here so

15   there's a record of what I am saying so that you can be assured

16   that you will have appellate counsel to take care of your

17   appeal.  All right?

18            THE DEFENDANT:  All right.

19            THE COURT:  All right, thank you.

20            MS. FLYNN:  Thank you, Your Honor.

21            THE CLERK:  All rise.  This Court stands in recess.

22        (Proceedings concluded at 10:42 a.m.)

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

1           I, Patricia G. Mitchell, Registered Merit Reporter,

Certified Realtime Reporter, in and for the United States

District Court for the District of Maryland, do hereby certify,

pursuant to 28 U.S.C. § 753, that the foregoing is a true and

correct transcript of the stenographically-reported proceedings

held in the above-entitled matter and the transcript page

format is in conformance with the regulations of the Judicial

Conference of the United States.

          Dated this 11th day of March 2023.


*Patricia G. Mitchell*
_____
Patricia G. Mitchell, RMR, CRR
Federal Official Reporter

**< Dates >**
**April** 32:13 .
**April 11, 2022,** 31:24 .
**December 7, 2022,**
 4:20 .
**February** 31:21 .
**June** 31:8 .
**March** 46:10 .
**March,** 31:21 .
**May** 20:7 .
**May 12** 30:24 .
**May 12, 2020** 30:21 .
**May 15, 2021,** 31:3 .
**November** 31:10 .
**November 30, 2021.**
 30:21 .
**September,** 4:3 .
**$100** 25:9, 41:22 .
**$300** 25:9, 41:22,
 42:18 .
**$5** 25:8, 41:21 .
**$82** 8:15, 13:14, 42:14 .
 .
 .
**< 0 >.**
**000** 6:25, 8:3, 25:8,
 41:21 .
**000-mile** 15:1 .
 .
 .
**< 1 >.**
**1** 2:11, 6:21, 6:22, 7:1, 7:12,
 8:24, 10:18, 25:7, 41:19,
 41:20 .
**1.2** 10:16 .
**10** 41:16, 45:22 .
**100** 33:19 .
**11th** 46:10 .
**12** 24:20 .
**120** 26:19, 29:18 .
**13** 38:16 .
**14** 24:25, 35:16, 42:25 .
**140** 26:19, 29:18 .
**15** 38:13 .
**18** 9:12, 26:3, 28:10 .
**180** 38:14, 39:1 .
**1B1.4** 9:17 .
 .
 .
**< 2 >.**

**2** 2:11, 6:21, 7:2, 8:3, 10:10,
 10:18, 15:1, 25:7 .
**20** 24:24, 29:16, 30:4,
 30:12 .
**200** 4:20 .
**2019** 8:18, 10:13, 27:9,
 27:15, 27:24 .
**2020** 8:22, 10:13, 10:14,
 20:7, 30:25 .
**2023** 46:10 .
**21201** 1:32, 1:42 .
**217** 1:40 .
**24** 11:8, 12:11, 13:10 .
**240** 29:16, 30:4, 41:25,
 42:5 .
**25** 9:1 .
**27** 29:14 .
**28** 46:5 .
**2d1.1(a)(5** 15:13 .
**2nd** 1:41 .
 .
 .
**< 3 >.**
**3** 2:11, 6:21, 7:2, 10:10,
 10:18, 25:7, 41:19,
 41:20 .
**30** 1:18, 2:2, 6:23, 7:5, 7:14,
 10:8, 10:21, 15:13,
 15:21 .
**300** 8:15, 13:14, 42:14 .
**324** 25:4, 41:17 .
**325** 29:13, 29:24 .
**3553(a** 5:13, 26:3, 28:10,
 39:20, 42:23 .
**3553(a)(2** 41:25 .
**36** 1:31, 24:12, 25:3 .
**3661** 9:12 .
**3b1.1(a** 16:4, 23:12 .
**3C1.1** 19:17, 19:19 .
**3D1.1** 6:22 .
 .
 .
**< 4 >.**
**40** 7:18, 25:8, 41:21 .
**400-some** 29:24 .
**405** 25:4, 41:17 .
**42** 45:22 .
**43** 39:21 .
**4th** 1:31 .
 .

 .
**< 5 >.**
**5** 6:25 .
**500** 7:1, 8:25, 10:11, 12:9,
 14:12, 14:13, 15:10 .
 .
 .
**< 7 >.**
**753** 46:5 .
**7A** 1:23 .
 .
 .
**< 9 >.**
**9** 1:18, 2:2 .
**911** 35:20 .
**[noise** 39:7 .
 .
 .
**< A >.**
**a.m.** 1:18, 2:2, 45:22 .
**Aberdeen** 17:9 .
**ability** 42:13 .
**able** 35:8, 36:16, 45:11 .
**above-entitled** 46:7 .
**Absolutely** 22:14, 29:8,
 33:1, 41:6 .
**abuse** 39:24, 43:24,
 44:2 .
**accepted** 8:10, 39:20 .
**access** 32:6 .
**accident** 22:16 .
**accommodating** 31:9 .
**according** 6:20 .
**Accordingly** 10:6 .
**account** 12:13, 12:20,
 38:21 .
**accountability** 34:10 .
**accumulated** 24:20 .
**accurate** 25:11, 25:16 .
**accurately** 11:9 .
**Achilles** 31:4, 31:13,
 32:6 .
**acknowledgment** 8:6 .
**acquittal** 9:4, 9:6 .
**across** 18:25 .
**Act** 36:15 .
**activities** 13:6, 19:5, 19:7,
 23:13, 24:5, 27:4, 29:5,
 33:16 .
**activity** 19:3, 23:1,

40:8 .
**actual** 17:16 .
**Actually** 4:2, 14:19, 17:5,
 17:8, 17:15, 28:12 .
**addition** 8:6, 13:4, 14:5,
 36:20, 40:24, 43:21 .
**additional** 4:10, 26:21 .
**address** 10:22, 17:2, 17:3,
 17:5, 17:14, 17:21,
 24:15, 34:14, 39:4 .
**addressed** 6:10, 8:19,
 17:10, 24:14, 33:11,
 39:5 .
**addresses** 10:23 .
**addressing** 11:5 .
**adequate** 26:8 .
**adequately** 5:24 .
**administration** 19:20 .
**admitted** 41:1, 41:3 .
**admonishments** 41:4 .
**adult** 41:15 .
**advised** 38:8 .
**advisory** 26:1, 41:17 .
**advocacy** 35:10,
 36:13 .
**advocate** 35:5, 36:16 .
**affect** 6:9 .
**affirmed** 22:3, 22:4 .
**afford** 26:8 .
**aggressive** 35:9 .
**ago** 9:2 .
**agree** 33:19, 34:6,
 41:23 .
**agreement** 12:17,
 12:21 .
**ahead** 2:23, 15:21 .
**airline** 7:22, 14:6 .
**airport** 20:10 .
**allegation** 18:19 .
**allegations** 19:10 .
**alleged** 13:6, 19:9,
 38:18 .
**allocation** 39:3 .
**allowed** 12:2, 13:2 .
**almost** 17:8 .
**already** 20:24, 22:18,
 27:23, 44:19 .
**altercations** 40:2 .
**although** 6:8, 34:7 .
**ambulance** 31:25 .

**AMERICA** 1:5 .
**Among** 24:22 .
**amount** 6:24, 8:15, 9:10, 10:4, 15:8, 29:1, 41:21, 42:18 .
**amounts** 16:12, 16:13, 28:5 .
**ample** 18:2 .
**Anderson** 8:10, 12:21, 13:17, 16:6, 17:17, 17:20, 17:23, 19:5, 20:9, 20:11, 20:12, 20:14, 21:17, 28:2 .
**anticipated** 18:8 .
**apartment** 17:9 .
**apologize** 39:12, 39:16 .
**appeal** 42:25, 44:16, 44:22, 45:1, 45:17 .
**appealing** 45:8 .
**appeared** 8:7 .
**appears** 15:22 .
**appellate** 44:21, 45:16 .
**applicable** 42:13 .
**apply** 14:24, 21:24, 23:8 .
**Applying** 24:12, 39:20 .
**appointment** 44:21 .
**appointments** 32:15 .
**appreciate** 35:14, 40:15 .
**appropriate** 6:11, 6:19, 9:16, 12:20, 13:4, 15:12, 26:2, 29:22, 30:4, 42:22, 43:4 .
**appropriately** 7:5 .
**arching** 10:19 .
**arguing** 12:12 .
**argument** 6:14, 12:6, 18:7, 18:10, 26:25, 42:1 .
**arguments** 5:18, 5:25, 6:5, 6:14 .
**arises** 40:23 .
**Arizona** 7:17, 13:17, 13:25, 14:1, 23:3 .
**arrested** 10:14, 20:21 .
**assert** 4:25 .
**assessment** 25:9, 41:21, 42:18, 43:23 .
**assist** 37:16, 45:7 .

**associated** 5:13, 7:8 .
**association** 26:15 .
**assured** 45:15 .
**attempt** 43:25 .
**attempted** 19:20 .
**Attorney** 1:30, 3:9, 4:11, 44:21 .
**attorneys** 36:15, 45:11 .
**audience** 34:13 .
**automobile** 41:2 .
**available** 33:25, 44:25 .
**aware** 30:16, 33:20, 35:11, 37:6, 38:11 .
**away** 28:20, 39:9 .
.

**< B >.**
**bachelor** 35:17 .
**back** 7:24, 8:5, 10:16, 13:15, 14:1, 14:2, 14:9, 14:13, 15:1, 16:20, 20:6, 20:11, 20:13, 21:1, 23:4, 23:5, 27:20, 27:22, 28:1, 32:8 .
**back.** 27:20 .
**backed** 34:3, 34:4 .
**background** 9:14 .
**backtrack** 37:5 .
**Baltimore** 1:16, 1:32, 1:42, 7:24 .
**banged** 22:19 .
**bars** 28:21 .
**base** 6:9, 6:23, 7:5, 7:12, 7:13, 10:7, 10:20, 11:8, 12:10, 13:9, 15:12, 15:21, 24:12, 24:24 .
**Based** 7:16, 13:7, 24:6, 39:23, 42:8 .
**Basically** 11:9, 11:21, 12:3, 13:6, 13:17, 34:3 .
**basis** 10:18, 21:19 .
**became** 33:25 .
**behalf** 35:10 .
**behavior** 28:20, 28:24, 40:20, 41:14 .
**behind** 21:15, 28:21 .
**belabor** 9:24 .
**believe** 3:16, 3:19, 4:3, 5:23, 6:7, 6:24, 11:8, 12:10, 13:3, 17:4, 30:3,

37:12, 42:11 .
**believed** 11:17 .
**believes** 16:22 .
**below** 42:21 .
**bench** 25:21 .
**bench.** 25:19 .
**benefit** 12:15 .
**Berger** 31:13, 32:5, 32:15, 32:17 .
**best** 33:1, 33:8 .
**bled** 35:21 .
**blind** 35:22, 40:3 .
**boosted** 6:16, 34:22 .
**boot** 31:17 .
**border** 18:25 .
**bound** 9:1 .
**box** 15:10 .
**brains** 21:15 .
**brief** 18:14 .
**Briefly** 3:10, 3:12, 13:13, 16:2 .
**bring** 14:9, 16:20, 17:9 .
**bringing** 20:10 .
**brother-in-law** 36:22 .
**brought** 20:6, 41:10 .
**Bureau** 29:2, 32:21, 33:2, 42:19, 43:6 .
**business** 21:10, 35:13 .
**Butner** 32:22, 32:23, 42:19 .

.
**< C >.**
**c)(5** 15:13 .
**C.** 46:5 .
**call** 2:4, 21:4, 30:3 .
**called** 36:4 .
**calling** 20:25, 31:25, 35:20 .
**calls** 16:8, 19:8 .
**capacities** 17:6 .
**captured** 6:5 .
**car** 7:22, 7:24, 14:7, 19:3, 22:24, 23:2 .
**card** 8:1, 8:2, 15:16, 23:22 .
**care** 31:5, 31:7, 31:15, 35:8, 35:11, 45:16 .
**career** 28:3 .
**Carolina** 32:22 .

**cars** 8:2, 23:4 .
**cars.** 21:18 .
**case** 2:4, 3:5, 5:25, 6:19, 9:3, 9:10, 9:11, 10:13, 10:14, 12:5, 13:23, 17:16, 19:11, 22:1, 22:3, 24:9, 26:11, 37:9, 38:22, 39:4, 42:1 .
**cases** 9:25 .
**cash** 15:17 .
**category** 24:21, 24:25, 25:1, 25:3 .
**Catherine** 1:38, 1:39, 2:15 .
**caught** 35:19 .
**caused** 35:22 .
**CDF** 31:4, 31:12 .
**Center** 21:1, 21:2 .
**certain** 12:5, 33:19 .
**certainly** 7:3, 15:24, 17:14, 23:19, 38:7, 41:7, 42:3 .
**CERTIFICATE** 46:1 .
**Certified** 46:3 .
**certify** 46:4 .
**cetera** 24:16, 44:6 .
**challenge** 12:18, 12:22, 12:23 .
**changed** 27:25 .
**character** 9:14 .
**characterization** 25:11, 25:16 .
**charge** 9:8, 23:19 .
**charged** 6:25, 10:10 .
**Charles** 1:31, 1:40 .
**Che** 2:7, 28:3 .
**CHE JARON DURBIN** 1:10 .
**check** 15:10 .
**childhood** 39:24 .
**children** 39:23 .
**chose** 11:12, 12:8, 37:16 .
**Christopher** 1:29, 2:8 .
**chronic** 33:10 .
**Churchill** 27:5 .
**Circuit** 10:1 .
**circumstance** 17:3, 33:21 .
**circumstances** 12:11, 13:3,

24:2, 26:4, 29:25, 34:7,
36:24, 38:22, 39:2,
41:7 .
**cite** 5:11 .
**cited** 9:3, 9:25, 22:1 .
**clarify** 3:25 .
**clear** 9:22, 16:18, 26:23,
41:14 .
**Clearly** 3:8, 8:4, 14:8,
16:14, 23:6, 23:17,
29:17 .
**CLERK** 45:21 .
**client** 3:18, 30:16, 34:13,
36:22, 37:2, 38:9 .
**co-conspirator** 12:14,
15:16 .
**co-conspirators** 19:9 .
**co-defendant** 7:15, 12:17,
16:7, 28:17, 29:12,
35:24, 37:24 .
**collective** 15:14 .
**comes** 20:11, 25:5,
26:24 .
**coming** 31:17 .
**Commission** 43:5 .
**Commitment** 43:2 .
**committed** 24:22 .
**common** 13:24, 15:1 .
**community** 37:1, 37:22,
40:16 .
**company** 8:19 .
**completed** 32:16 .
**completely** 33:22 .
**complicated** 38:12 .
**comply** 41:24 .
**Computer-aided** 1:49 .
**concealed** 14:15 .
**concerned** 22:10,
38:25 .
**concerning** 9:13, 9:21,
25:21 .
**conclude** 43:8 .
**concluded** 45:22 .
**conclusion** 13:1, 13:2 .
**conclusions** 12:18 .
**concurrently** 42:6,
42:7 .
**condition** 5:12, 5:13,
24:15 .
**conditions** 21:3, 26:20,

42:4, 43:11, 43:17,
43:20, 43:21, 43:22 .
**conduct** 9:8, 9:14, 9:21,
12:13, 27:2, 38:18,
39:21, 40:14 .
**Conference** 25:19, 25:21,
46:9 .
**confinement** 42:4 .
**confines** 4:23 .
**confirm** 4:9, 43:13 .
**conformance** 46:8 .
**conforming** 41:15 .
**connection** 10:17 .
**connections** 19:8 .
**consider** 9:16, 9:20, 11:8,
26:2, 26:4, 28:12, 29:16,
29:21, 30:11, 38:13,
39:1 .
**consideration** 30:1 .
**considerations** 28:10 .
**considering** 9:8, 42:2 .
**Conspiracy** 3:1, 6:22, 8:8,
8:11, 8:23, 10:4, 10:19,
14:18, 14:20, 15:4, 15:9,
15:18, 16:5, 16:14,
17:13, 18:22, 22:13,
23:18, 24:3, 24:11,
40:10, 40:19 .
**constitutional** 19:25,
20:1 .
**consultation** 4:12 .
**contact** 20:24, 40:4,
45:7 .
**contacted** 38:4 .
**contacts** 16:9 .
**contend** 21:22 .
**contest** 4:24, 5:4, 5:6 .
**contested** 5:18, 5:24, 6:21,
15:7, 15:22 .
**context** 35:4 .
**continue** 28:24 .
**continued** 27:17 .
**continues** 30:7 .
**continuously** 30:22 .
**contracting** 34:2 .
**contradicted** 22:6 .
**convict** 11:11 .
**convicted** 3:1, 9:15, 12:8,
27:14 .
**convicting** 12:7 .

**conviction** 15:9, 24:23,
25:10, 26:18, 27:8, 28:6,
37:25, 40:6, 40:9, 41:22,
42:5, 42:10, 42:11, 43:1,
45:8 .
**convictions** 24:23, 25:6,
26:17, 28:4, 28:23,
30:5 .
**convinced** 15:11 .
**cooperate** 41:11 .
**cooperating** 7:15,
12:14 .
**cooperating.** 25:22 .
**cooperative** 37:13 .
**coordinate** 45:4 .
**coordinating** 36:14 .
**copy** 3:20 .
**Correct** 3:20, 3:23, 4:7,
4:13, 5:2, 5:5, 5:8, 5:15,
5:19, 6:8, 24:17, 29:3,
32:11, 35:25, 37:7,
43:14, 46:6 .
**corroborated** 7:19 .
**corroborating** 37:24 .
**cost** 28:19, 28:20, 28:22,
30:9, 38:14 .
**costing** 28:21 .
**counsel** 2:9, 44:22, 45:14,
45:16 .
**Count** 7:1, 7:12, 8:24,
10:18, 25:7, 25:9, 41:22,
42:5 .
**country** 40:23 .
**Counts** 2:11, 3:1, 6:21, 7:2,
10:10, 10:11, 10:18,
25:6, 38:23, 41:18,
41:19, 41:20, 42:23 .
**County** 7:17, 20:22, 21:1,
30:22 .
**couple** 4:15, 10:16 .
**coupled** 8:17, 14:10,
29:18 .
**course** 5:11, 17:21, 24:8,
40:9, 40:22, 43:23,
44:25 .
**Courtroom** 1:23, 2:20,
28:15, 36:20 .
**courts** 26:3, 34:3,
39:17 .
**cousin** 36:22 .

**COVID** 30:18, 30:21, 33:21,
35:19 .
**crack** 16:10 .
**credibility** 14:3 .
**credible** 22:7, 22:9, 24:9,
26:25 .
**credibly** 23:21 .
**credit** 8:1, 8:2, 15:16,
23:22, 27:12, 30:24 .
**crime** 37:21 .
**crimes** 26:10 .
**Criminal** 1:9, 21:12, 23:1,
23:18, 24:20, 24:22,
24:23, 24:25, 25:3,
26:14, 27:2, 27:3, 36:15,
38:25, 40:5, 40:14,
40:21, 41:14, 42:10 .
**cross-examine** 21:15 .
**CRR** 46:16 .
**cumulative** 26:21 .
**currency** 8:15 .
.

**< D >** .
**damage** 40:15 .
**date** 4:5, 30:23 .
**Dated** 4:20, 46:10 .
**daughters** 36:21 .
**day** 46:10 .
**days** 10:16, 42:25 .
**deal** 27:17, 30:7 .
**dealer** 27:1, 40:12 .
**dealers** 40:15 .
**death** 40:23 .
**December 19, 2022**
1:17 .
**decided** 28:23, 41:11 .
**decision-making**
39:13 .
**dedication** 36:13 .
**defender** 44:20, 45:2, 45:8,
45:13 .
**defense** 19:25 .
**defies** 14:3 .
**definitely** 33:3 .
**degree** 21:14, 21:16,
35:17 .
**delay** 31:14, 31:25, 32:6,
33:11 .
**delays** 32:19 .

**deliberation** 12:3 .
**delivery** 17:4 .
**demonstrated** 23:19 .
**demonstrates** 15:15 .
**demonstration** 40:14,
41:14 .
**denies** 19:10, 19:11 .
**departure** 9:19 .
**dependents** 39:22 .
**deserve** 36:10, 36:11 .
**designation** 12:10 .
**Despite** 15:9, 40:7, 40:12,
40:25, 41:3 .
**destination** 17:4 .
**detained** 43:2 .
**Detention** 21:1, 21:2 .
**deter** 27:2, 27:8, 28:8,
29:20 .
**determination** 10:7 .
**determine** 7:4, 43:24 .
**determining** 9:18 .
**deterred** 28:6, 40:7,
40:13 .
**deterrent** 26:8 .
**developed** 31:20 .
**diagnosed** 30:18,
30:20 .
**different** 38:24 .
**difficult** 36:24 .
**direct** 34:19 .
**directed** 23:21 .
**directly** 22:6 .
**dirty** 21:12 .
**disbelieved** 24:7 .
**discussed** 43:9 .
**dismissed** 42:24 .
**Distribute** 3:2, 6:23, 12:9,
15:19 .
**distributed** 23:20 .
**distributing** 23:14,
24:10 .
**distribution** 6:25, 18:1,
23:13, 23:15, 24:4, 40:9,
41:1, 41:6, 42:11 .
**District** 1:1, 1:2, 46:4 .
**DIVISION** 1:3 .
**divorced** 39:25 .
**doctor** 32:6 .
**document** 4:23 .
**documentation** 19:1,

19:2 .
**documents** 23:23 .
**doing** 2:18, 21:17, 37:24,
40:19 .
**doll** 14:15 .
**done** 22:16, 22:23 .
**doors** 17:18, 34:18 .
**double** 29:17, 34:18 .
**doubt** 40:11 .
**dovetail** 18:8 .
**down** 11:22, 17:18, 29:18,
29:20, 33:22, 39:10 .
**draw** 27:14 .
**drive** 27:20 .
**drives** 20:12 .
**driving** 7:24, 14:2, 23:4,
23:5 .
**drove** 10:15, 14:1 .
**drug** 6:8, 9:5, 15:8, 21:10,
22:8, 22:14, 24:11,
26:24, 26:25, 28:4, 28:6,
28:23, 30:5, 40:6, 40:9,
40:11, 40:15, 40:19,
40:24, 41:5, 44:7 .
**drugs** 7:20, 10:12, 14:19,
17:16, 27:17, 27:20,
27:22, 27:25, 30:8 .
**due** 6:23, 13:19 .
**Dunnigan** 21:22 .
**duration** 44:5 .
**during** 44:25 .
.

**< E >.**
**earlier** 43:13 .
**ECF** 4:20 .
**echoed** 9:17 .
**effect** 39:13 .
**effort** 5:14, 14:9, 14:21 .
**efforts** 35:13, 35:14,
36:14 .
**either** 44:20 .
**elective** 34:5 .
**encouragement** 39:15 .
**end** 24:11 .
**ended** 4:19, 31:23, 32:5,
41:12 .
**endure** 42:4 .
**enforcement** 13:15,
37:22 .

**engage** 14:16, 28:24,
44:11 .
**engaged** 2:21, 2:22, 23:14,
24:4, 40:25, 41:1 .
**engaging** 40:7, 40:13,
41:5 .
**enhancement** 4:25, 7:10,
18:18, 18:19, 19:18,
19:23, 21:20, 22:3,
23:8 .
**enhancements** 19:13,
24:11 .
**entire** 14:20, 18:20, 26:11,
38:20 .
**entitled** 33:18 .
**Esquire** 1:29, 1:38 .
**essence** 27:9 .
**establish** 15:4 .
**estimating** 11:16 .
**et** 24:16, 44:5 .
**event** 41:10 .
**everyday** 34:5 .
**everyone** 2:3, 2:20,
33:21 .
**everything** 20:19, 21:13,
33:22, 36:16, 45:12,
45:14 .
**evidence** 8:16, 9:9, 10:3,
11:13, 11:24, 12:4, 12:6,
14:12, 14:23, 14:24,
14:25, 15:12, 15:14,
18:2, 20:3, 20:4, 23:17,
23:19, 23:25, 24:3, 24:6,
24:9 .
**exacerbated** 31:6,
31:15 .
**exactly** 22:1 .
**excess** 8:11, 8:21 .
**exhilarating** 27:6 .
**experienced** 40:11 .
**experts** 32:4 .
**explain** 45:10, 45:12 .
**explained** 18:21 .
**extensive** 40:4 .
**extremely** 28:17 .
**eye** 28:21, 28:22, 28:25,
29:7, 31:24, 32:4, 32:8,
32:9, 35:20, 35:24,
37:17, 40:3, 41:8,
41:12 .

.
.
**< F >.**
**facilitate** 17:14, 21:9, 45:5,
45:6, 45:12 .
**facilities** 32:25 .
**facility** 33:2, 33:9,
42:19 .
**facing** 27:13, 28:5 .
**fact** 11:10, 12:21, 16:23,
21:14, 22:17, 22:25,
24:2, 24:7, 29:11, 30:7,
30:9, 42:9, 42:21 .
**factor** 26:1 .
**factors** 5:12, 5:13, 26:3,
39:20, 42:9, 42:23 .
**facts** 12:19, 21:24 .
**factually** 38:3 .
**failure** 40:15 .
**fairly** 6:13 .
**fake** 17:17 .
**fall** 42:20 .
**false** 19:1, 22:10, 22:12,
23:25 .
**falsely** 5:1, 22:4, 23:7,
23:13, 24:9, 40:25 .
**familiar** 7:14, 26:11 .
**family** 20:17, 28:21, 34:13,
39:13 .
**Fantastic** 34:23 .
**far** 10:10, 38:25 .
**fashioning** 26:2, 38:22 .
**father** 36:22 .
**Federal** 24:23, 26:18, 27:8,
28:6, 30:6, 40:6, 42:10,
45:7, 46:17 .
**feeling** 27:6 .
**feelings** 21:10 .
**fell** 42:8 .
**felony** 26:17, 28:4,
30:5 .
**festering** 32:17 .
**few** 4:1, 4:14 .
**fianc** 39:14 .
**fifth** 28:5, 42:11 .
**file** 31:6, 31:8, 42:25 .
**filed** 6:15, 31:10, 43:5 .
**filing** 4:20, 44:15 .
**financial** 23:22 .
**find** 10:3, 12:4, 14:11,

15:21, 23:16, 41:6 .
**finding** 9:1, 9:5, 9:6, 14:25, 25:15, 25:16 .
**findings** 42:22 .
**finds** 23:25 .
**fine** 23:2, 24:16, 25:8, 41:20, 42:12 .
**finish** 34:12 .
**First** 6:18, 27:24, 30:18, 35:18, 39:7, 39:12 .
**five** 7:7, 7:13, 8:8, 8:11, 8:22, 9:10, 10:4, 10:8, 10:20, 12:7, 15:5, 15:18, 16:14, 25:6, 25:8, 32:14, 41:20, 42:6 .
**flew** 13:25, 14:1 .
**flies** 20:8 .
**Floor** 1:31, 1:41 .
**flying** 7:23, 23:3 .
**folks** 34:5 .
**follow** 44:3 .
**follow-up** 31:10, 32:15 .
**foregoing** 46:5 .
**forfeiture** 42:14 .
**form** 8:24 .
**format** 46:8 .
**formed** 8:20 .
**forms** 10:18 .
**forth** 15:14, 23:4, 26:3 .
**forward** 18:17, 34:17 .
**found** 2:11, 22:7, 22:9 .
**four** 8:17, 13:18, 25:8, 26:16, 28:4, 41:20 .
**four-level** 16:3, 16:25, 18:3, 18:17 .
**Fourth** 10:1, 42:11 .
**Frankly** 18:7, 28:7, 29:10, 29:12, 38:6, 40:16 .
**frequency** 16:13 .
**full** 34:24 .
**fully** 2:21, 2:22, 6:16, 11:4, 34:20, 39:10 .

.

**< G >** .
**G.** 46:2, 46:16 .
**gather** 11:3 .
**gave** 34:7 .
**GED** 39:22 .
**general** 34:5 .

**generalized** 5:17 .
**generally** 6:5 .
**generated** 3:5 .
**GEORGE LEVI RUSSELL, III** 1:22 .
**Gerrick** 16:7, 18:1 .
**gets** 21:1 .
**getting** 7:24, 18:24, 30:19, 31:14, 32:1, 34:1, 34:5, 45:7, 45:13 .
**girlfriend** 35:15, 35:16, 39:23, 40:21 .
**give** 18:13 .
**given** 11:18, 12:21, 16:12, 27:13, 29:24, 30:4, 38:14, 42:3 .
**giving** 27:11, 41:7 .
**gotten** 10:15, 17:22, 36:10 .
**Government** 4:17, 7:3, 7:11, 10:19, 11:10, 11:12, 11:21, 12:12, 12:16, 13:14, 16:3, 16:22, 18:8, 19:17, 19:24, 22:6, 24:1, 30:2, 33:15, 33:20, 34:8, 34:10, 37:3, 41:23 .
**gram** 22:22 .
**grams** 6:25, 7:1, 8:25, 10:11, 12:9, 14:12, 14:13, 15:10 .
**granted** 42:17 .
**greater** 29:23, 41:24 .
**Group** 6:22 .
**grouped** 6:21 .
**grouping** 25:2 .
**guess** 19:2 .
**guideline** 9:19, 19:17, 25:3, 25:12, 25:17, 26:1, 29:24, 41:17, 42:2, 42:8, 42:20, 42:21 .
**guidelines** 5:8, 6:19, 9:17 .
**guilt** 22:11, 22:15 .
**guilty** 2:11, 8:7, 8:9, 25:20 .
**guy** 17:7, 17:8 .

.

.

**< H >** .

**half** 16:11, 29:14 .
**hand** 18:12 .
**handle** 6:18, 32:7, 43:8, 44:16 .
**hands** 28:17, 29:11 .
**hanging** 17:6 .
**happen** 21:9 .
**happened** 27:19, 36:3, 36:9, 37:3, 37:4, 38:21, 41:9 .
**happening** 31:23, 32:5 .
**happens** 29:1 .
**happy** 6:10, 11:1, 16:1, 25:24, 30:14, 35:2 .
**hardly** 23:1 .
**Harford** 7:17, 20:22, 21:1, 30:22 .
**Hayes** 10:1 .
**healer** 36:14 .
**health** 5:12, 38:15, 40:1 .
**healthcare** 35:5, 35:9 .
**hear** 7:3, 7:9, 11:1, 13:5, 15:24, 16:1, 18:5, 19:14, 25:24, 28:14, 30:14, 34:11, 35:2 .
**heard** 7:15, 8:9, 18:20, 18:21, 42:1, 43:10 .
**HEARING** 1:21 .
**held** 46:7 .
**helped** 36:21 .
**hereby** 46:4 .
**high** 34:2, 42:2 .
**higher** 28:12 .
**history** 24:20, 24:21, 24:25, 25:3, 26:5, 26:14, 38:25 .
**hit** 27:7 .
**home** 10:15 .
**Homes** 8:21, 17:10 .
**HONORABLE** 1:22 .
**hope** 17:12 .
**Hopefully** 33:6 .
**hospital** 32:1 .
**hotel** 7:22 .
**hour** 35:21, 36:1 .
**house** 17:18, 18:25, 20:5, 22:23, 22:24, 27:10 .
**hypertension** 30:20, 35:19 .

.

.

**< I >** .
**Ibanaga** 10:1 .
**identify** 11:3, 11:17 .
**identifying** 11:12 .
**ignore** 11:10, 11:22, 12:3, 13:2 .
**illegal** 18:23, 19:3, 40:23 .
**impede** 19:20 .
**impeded** 19:20 .
**import** 15:19 .
**important** 28:9, 44:24, 45:1 .
**impose** 9:18, 27:1, 42:12, 43:22 .
**imposed** 26:6, 29:15, 42:18 .
**imposing** 9:16 .
**incapable** 41:15 .
**incarcerated** 30:18, 30:22, 33:13, 34:8, 34:9, 40:2, 40:12 .
**incarceration** 26:22, 33:12, 38:15 .
**include** 4:24, 19:22, 25:21, 43:23 .
**included** 16:5, 38:17, 40:2 .
**including** 26:4, 42:9 .
**increase** 16:3, 16:25, 18:3, 18:9 .
**incumbent** 37:21 .
**indicate** 23:23 .
**indicated** 7:4, 7:25, 8:11, 8:24, 19:2, 19:9, 21:13, 24:16, 29:13, 32:18, 33:16, 43:12, 44:19 .
**indicates** 31:24 .
**indication** 24:1 .
**Indictment** 2:11 .
**individual** 7:10, 26:13, 28:18 .
**individuals** 16:16 .
**industry** 35:9 .
**infected** 36:6 .
**infection** 31:20, 31:21, 32:17 .
**inform** 38:10 .

**information** 9:13, 9:21, 37:5 .
**Initially** 26:18, 27:7, 29:13, 35:23 .
**injuries** 33:14, 33:17, 40:1 .
**injury** 28:16, 29:11, 31:5, 31:11, 32:13, 38:11 .
**inmates** 34:4 .
**innocence** 22:11, 22:15 .
**Inspection** 8:15, 17:22 .
**Inspector** 1:46, 2:9, 8:14 .
**intensity** 44:5 .
**Intent** 3:2, 6:22, 12:9, 15:19 .
**intentionally** 17:13, 23:6 .
**intercepted** 17:22 .
**interferes** 21:23 .
**international** 41:2 .
**interruption.]** 39:8 .
**interstate** 41:2 .
**intervention** 33:5, 33:7 .
**introduced** 19:6 .
**investigated** 37:10 .
**investigation** 19:21, 37:16 .
**involved** 6:24, 8:8, 8:23, 9:8, 10:4, 14:20, 15:8, 15:17, 17:3, 18:22, 18:23, 19:4, 19:7, 21:11, 22:5, 22:12, 22:18, 23:1, 23:2, 24:10, 26:12, 26:13 .
**involved.** 11:19 .
**involvement** 26:14 .
**issue** 6:8, 15:7, 15:22, 36:3, 37:12 .
**issues** 4:24, 5:7, 5:8, 5:18, 5:24, 6:24, 10:23, 20:23, 30:16, 35:5 .
.

**< J >.**
**J.** 1:29 .
**Jack** 8:10, 13:17, 16:6, 17:17, 17:20, 17:23,

19:5, 20:9, 20:10, 20:12, 20:13, 21:17, 28:2 .
**Jackson** 1:45, 16:7, 16:8, 16:9, 18:1 .
**jail** 31:9, 37:3 .
**Jameka** 7:16, 8:22, 10:14, 16:6, 16:19, 19:5, 20:5, 20:14, 22:22, 23:3, 26:13, 27:19 .
**Jaron** 2:7 .
**Jerry** 17:19 .
**Jessica** 1:45 .
**job** 20:16 .
**Judgment** 43:2 .
**Judicial** 46:8 .
**jumping** 18:17 .
**jury** 3:3, 4:6, 8:24, 9:1, 9:4, 9:5, 11:9, 11:11, 11:22, 11:25, 12:3, 12:4, 12:7, 12:24, 13:1, 13:3, 13:20, 13:24, 14:13, 14:17, 15:10, 22:7, 22:8, 24:7 .
**Justice** 4:25, 5:1, 18:9, 18:20, 19:21, 22:3, 23:12, 36:15, 40:5, 41:10 .
.

**< K >.**
**keeping** 39:15 .
**kicked** 20:18 .
**kilo** 7:21 .
**kilogram** 8:18, 8:21, 10:13, 14:13, 14:14 .
**kilograms** 7:7, 7:13, 7:18, 8:8, 8:12, 8:17, 8:23, 9:10, 10:5, 10:8, 10:16, 10:20, 12:8, 15:5, 15:18 .
**kilos** 13:18 .
**kind** 20:22, 27:13, 38:7, 40:14 .
**knows** 28:13, 30:8, 37:15 .
.
.

**< L >.**
**lack** 31:5, 41:8 .
**large** 7:19 .

**large-scale** 40:10, 40:18 .
**last** 7:21, 29:17, 40:6 .
**later** 10:16, 26:19 .
**Law** 1:39, 9:22, 9:23, 13:15, 26:7, 28:9, 37:22 .
**laws** 41:15 .
**leader** 15:23, 16:4, 16:19, 16:23, 40:18 .
**learn** 28:23 .
**learning** 40:16 .
**least** 7:7, 7:12, 8:16, 8:22, 8:25, 10:8, 15:4, 15:18, 29:6, 29:16, 30:11 .
**leave** 20:11 .
**leaving** 40:3 .
**left** 2:16 .
**leg** 36:3, 36:6 .
**lengths** 17:24 .
**leniency** 42:3 .
**lenient** 40:5 .
**lenity** 30:3 .
**less** 22:21 .
**lesson** 40:16 .
**letters** 36:4 .
**level** 6:9, 6:23, 7:5, 7:12, 7:13, 10:7, 10:8, 10:21, 11:8, 12:10, 13:10, 15:12, 15:13, 15:21, 24:12, 25:2 .
**levels** 18:1 .
**life** 28:25, 29:9, 40:20 .
**light** 42:22 .
**likewise** 8:10 .
**limitation** 9:13, 9:20 .
**limited** 16:5 .
**link** 13:5 .
**lives** 30:8, 30:9 .
**LLC** 8:21 .
**location** 23:20, 44:5 .
**locked** 20:25, 30:21, 33:17 .
**long** 9:8, 37:25 .
**look** 13:23, 14:23, 20:6, 28:8 .
**looked** 27:16 .
**Looking** 22:19, 24:19 .
**lose** 36:6 .
**loss** 41:8 .
**lost** 20:19, 21:13, 28:25,

29:7, 29:9, 35:20 .
**lot** 36:25 .
**loved** 21:4 .
**lucky** 35:4 .
.
.

**< M >.**
**M-u-r-r-a-y** 34:25 .
**Maguire** 17:19 .
**mail** 27:21, 27:22 .
**mailed** 17:15, 17:19, 27:18 .
**mailing** 13:16 .
**majority** 8:20 .
**mandatory** 25:5, 41:18, 43:17, 43:21 .
**manipulated** 23:18 .
**manufacture** 15:19 .
**marijuana** 18:23, 19:10, 20:4, 20:5, 22:22, 23:14, 24:2 .
**marijuana.** 20:3, 22:20 .
**married** 21:6, 21:8, 39:25 .
**marry** 38:8 .
**Marshal** 33:20 .
**Maryland** 1:2, 1:16, 7:17, 14:10, 28:1, 32:3, 46:4 .
**mask** 2:24, 6:16, 11:5, 34:20, 39:11 .
**masked** 2:20 .
**masking** 2:19 .
**master** 21:14, 21:16 .
**material** 22:11, 22:15, 23:7 .
**matter** 2:7, 21:11, 22:11, 43:1, 44:17, 46:7 .
**matters** 23:7 .
**MD** 1:32, 1:42 .
**mean** 33:17, 36:9 .
**medical** 30:16, 30:17, 31:5, 31:7, 31:15, 32:3, 32:25, 33:2, 33:18, 34:4, 35:10, 35:18, 36:2 .
**meeting** 20:9 .
**meets** 20:12 .
**member** 34:13 .
**members** 16:5, 28:14 .
**memo** 6:10, 9:3, 9:25 .

53

memoranda 4:17, 4:19,
  5:22, 6:4, 15:25 .
memorandum 22:2,
  28:11 .
mention 43:21 .
mentioned 26:12, 42:9 .
Merit 46:2 .
methods 44:1 .
Michael 1:46, 2:9 .
microphone 3:8,
  39:10 .
miles 8:3 .
million 25:9, 41:21 .
minimum 25:5, 27:3,
  41:18 .
minute 20:23 .
missed 27:7, 27:9 .
missing 28:22 .
mistake 22:17 .
mistaken 38:17 .
misunderstandings
  4:15 .
Mitchell 46:2, 46:16 .
MO. 27:25 .
modality 44:5 .
Mom 17:9, 20:5, 22:22 .
Money 11:19, 13:16, 14:10,
  17:4, 17:15, 17:19,
  22:13, 27:21, 27:22,
  28:1 .
monies 42:14 .
months 24:25, 25:4, 26:19,
  29:13, 29:16, 29:24,
  30:4, 31:22, 32:17,
  38:14, 39:1, 41:17,
  41:25, 42:5 .
morning 2:4, 2:6, 2:13,
  2:15, 2:17, 2:18 .
mother 8:19, 17:2, 17:3,
  17:5, 17:10, 17:13,
  27:10 .
motion 31:8, 31:10 .
motions 31:6 .
move 7:9, 39:9 .
moved 4:5 .
moving 44:24 .
MR. ROMANO 6:13 .
MRI 31:8 .
MS. MURRAY 34:21, 34:25,
  35:15, 36:18 .

MTC 32:1 .
multiple 7:16, 13:25, 14:6,
  15:2, 15:3, 16:9,
  30:5 .
Murray 34:21, 34:25, 35:1,
  35:5, 35:7, 35:12, 36:20,
  39:14, 45:3 .

.

< N > .
name 17:16, 17:17, 17:20,
  34:24 .
namely 22:11, 23:11, 23:14,
  40:21 .
narcotic 40:24 .
narcotics 6:24, 15:8, 23:13,
  23:20, 40:8 .
nature 26:4 .
necessarily 34:8 .
necessary 29:23, 33:6,
  33:7, 41:24 .
need 3:14, 4:10, 14:21,
  21:8, 26:5, 41:13 .
needed 32:7, 35:21,
  36:5 .
needs 27:1, 29:15, 29:21,
  29:25 .
neglect 39:25 .
nevertheless 34:9, 41:1,
  41:5, 41:9 .
next 15:22 .
No. 1:9, 4:20, 22:25 .
none 36:11 .
nonetheless 42:22 .
normal 39:24 .
North 1:40, 32:22 .
NORTHERN 1:3 .
note 4:24, 40:4, 42:7,
  43:19 .
Noted 42:17 .
notes 1:49 .
noteworthy 40:24 .
notice 44:16 .
noting 25:14 .
notwithstanding
  17:21 .
number 5:11, 11:20 .
numeral 25:1 .
nurse 35:16 .

.

< O > .
oath 22:4 .
object 15:4, 18:16, 18:17,
  19:13, 24:15 .
objection 30:24, 42:15,
  43:19 .
objections 23:10, 24:14,
  25:15 .
objective 11:24 .
objectively 37:20 .
obstruct 5:1, 19:20,
  43:25 .
obstructed 19:19,
  23:12 .
obstruction 4:25, 18:9,
  18:19, 19:18, 19:23,
  21:20, 22:3, 23:8 .
obtain 14:9, 16:20,
  17:25 .
obtains 20:12 .
obviously 10:11, 13:4,
  18:20, 22:8, 38:24 .
occurs 37:21, 40:23 .
off. 27:23 .
offender 28:4 .
offense 6:9, 6:23, 7:5, 7:12,
  7:13, 9:15, 10:7, 10:8,
  10:20, 11:8, 12:10, 13:9,
  15:12, 15:13, 15:21,
  18:3, 18:18, 24:12,
  24:22, 25:2, 26:5,
  26:7 .
Office 1:30, 1:39, 44:20,
  45:2, 45:13 .
Officer 1:45, 44:4 .
officers 13:15 .
Official 46:1, 46:17 .
Okay 5:7, 6:12, 14:18,
  19:12, 21:18, 36:23,
  45:6 .
old 39:21 .
Once 10:23, 17:25,
  22:19 .
One 8:3, 8:17, 10:13, 10:23,
  14:13, 14:14, 14:15,
  15:2, 17:6, 20:11, 21:16,
  26:1, 26:17, 34:12,
  36:15, 37:1, 38:9, 38:10,
  40:3, 41:18, 45:10 .

ongoing 14:8, 19:7,
  33:5 .
open 42:23 .
operating 29:10 .
opinion 37:8 .
opportunity 3:4, 3:9, 3:17,
  11:11, 12:18, 12:22,
  12:23, 13:5, 18:14,
  43:16 .
option 12:7 .
Order 5:14, 10:3, 36:4,
  42:14, 43:2 .
ordering 16:9 .
organization 5:5 .
organizer 15:23, 16:4,
  16:18, 16:23, 40:18 .
organizer/leader 5:5,
  23:11, 23:17, 23:23,
  24:8 .
originally 4:2 .
others 18:2, 23:18 .
Otherwise 6:13, 9:21 .
ounce 14:2, 22:21 .
ounces 14:2 .
outfit 21:15 .
outlines 15:25 .
outside 17:7, 32:4 .
outstanding 36:15,
  45:11 .
overall 10:19 .
own 13:24, 23:24 .

.

< P > .
package 17:1, 17:8, 22:23,
  27:9, 27:15, 27:24 .
page 46:7 .
pandemic 34:6 .
panel 36:15, 45:11 .
paramour 40:21 .
parcel 16:14 .
part 5:19, 7:19, 16:14,
  17:13, 34:11, 38:17 .
participate 44:2 .
participation 44:4 .
particular 10:23, 12:5,
  15:20, 24:3, 44:10 .
path 11:22 .
Patricia 46:2, 46:16 .
pay 8:16, 42:13 .

paying 43:23 .
Pecukaitis 1:46, 2:10 .
Pending 15:7, 23:9 .
people 16:15, 19:7, 30:8,
   30:9, 33:25, 40:17 .
percent 33:19 .
Perez 22:2, 22:9 .
perform 32:10 .
perhaps 28:14, 28:15 .
periods 40:13 .
perjury 21:23 .
permanently 30:19 .
perpetrator 38:18,
   41:10 .
person 9:14, 37:17,
   40:20 .
personal 16:12, 16:17,
   29:25 .
phone 19:8 .
physical 5:12, 30:1,
   40:1 .
picked 11:18, 27:23 .
picking 20:10 .
place 20:16, 33:8, 42:3 .
placed 9:13, 29:6 .
Plaintiff 1:7, 1:27 .
plan 27:19 .
plea 8:9, 12:16, 12:21,
   25:20 .
plead 12:19 .
please 2:5, 3:7, 34:23 .
pled 8:7 .
podium 34:19 .
point 9:24, 12:24, 22:1,
   27:21, 33:6, 33:24, 34:6,
   36:6, 36:20 .
pointed 9:2, 24:1,
   24:10 .
points 4:15, 24:21,
   25:1 .
policies 2:19 .
policy 25:20 .
poor 39:25, 40:1 .
position 7:11, 10:19, 13:9,
   29:6, 37:4, 44:16 .
positive 39:16 .
Possess 3:2, 15:19 .
possession 6:22, 12:8 .
possible 45:2 .
post 20:18 .

Postal 1:46, 2:9, 8:14, 17:7,
   17:8, 17:22 .
prepared 43:3 .
preponderance 9:9, 10:3,
   12:4, 14:11, 14:24,
   15:11, 23:16, 23:25 .
Present 1:45, 2:9, 24:22,
   38:19 .
presented 11:13 .
presentence 3:5, 4:10,
   4:12, 6:20, 23:10, 24:17,
   39:24, 43:14 .
presided 7:14 .
pretrial 21:2 .
pretty 26:23 .
prevent 9:7 .
previous 24:23, 28:23 .
previously 27:14 .
primary 5:7 .
principle 10:2 .
prior 21:12, 26:14, 26:16,
   28:4, 30:5, 30:19,
   41:14 .
Prisons 29:2, 32:21, 33:2,
   42:19, 43:6 .
private 44:21 .
pro 4:19, 6:14 .
probably 31:20, 33:1,
   36:8 .
Probation 1:45, 24:21,
   30:6, 44:4 .
problem 27:21, 31:6,
   31:15, 33:10, 36:18 .
problems 30:17, 33:10 .
proceeding 25:21 .
Proceedings 1:20, 45:22,
   46:6 .
proceeds 22:14 .
process 38:7 .
produced 8:2 .
productively 43:8 .
program 44:3, 44:5, 44:8,
   44:10 .
prohibited 9:22, 9:23,
   43:25 .
promote 26:7, 28:9 .
proof 10:2 .
proper 12:10, 13:9, 31:5,
   31:7, 31:15, 32:3, 35:8,
   35:10, 36:5 .

properly 37:9 .
prosecuted 27:11 .
prosecution 19:21, 37:10,
   37:16 .
protect 26:9, 27:3, 28:8,
   41:13 .
provide 26:7 .
provided 34:4 .
provider 44:5 .
provides 19:19 .
public 26:10, 27:3, 28:9,
   41:13, 44:20, 45:2, 45:8,
   45:13 .
pull 39:10 .
punishment 26:8 .
pure 12:6 .
purpose 45:8, 45:13 .
purposes 2:25, 9:16, 11:5,
   37:10, 41:25, 42:23,
   44:22 .
Pursuant 2:19, 6:21, 15:13,
   16:3, 23:11, 46:5 .
put 15:14, 42:3, 45:9 .
puts 25:2 .

.

< Q > .
quantities 7:4, 16:10 .
quantity 6:9, 7:20, 9:5,
   11:12, 11:14, 11:16,
   11:25, 12:5, 15:20,
   22:8 .
question 24:6, 28:16 .
quickly 38:8 .
Quite 4:1, 28:7, 29:9,
   29:12, 40:16 .
quote 27:5 .

.

< R > .
raided 18:25 .
raise 24:12, 36:21 .
raising 39:23 .
ran 17:8 .
range 9:19, 25:3, 25:7,
   25:8, 25:12, 25:17, 26:1,
   29:24, 41:17, 41:19,
   41:20, 42:2, 42:8, 42:20,
   42:21 .
rate 13:18 .

reach 44:20, 45:1 .
reached 11:20, 13:1,
   42:7 .
reaching 45:12 .
read 43:16 .
readily 41:3 .
real 17:20, 26:25,
   40:15 .
really 21:10, 21:25, 44:24,
   45:1 .
Realtime 46:3 .
reason 20:20 .
Reasons 16:24, 21:8, 23:7,
   30:10, 43:3 .
recall 7:21, 8:13, 17:6,
   20:21 .
recalls 10:12 .
receipts 15:16 .
receive 4:18, 9:15,
   41:16 .
received 4:15, 4:17, 12:15,
   13:7, 24:24, 26:19,
   35:18, 38:16, 40:5 .
recess 45:21 .
recidivist 26:25, 28:20 .
recollection 37:1 .
recommend 28:13, 29:13,
   32:21, 42:19, 44:7 .
recommendation
   29:12 .
recommended 31:9 .
record 6:15, 11:4, 20:14,
   21:12, 34:24, 40:21,
   45:15 .
recorded 45:14 .
records 7:22, 7:23, 8:3,
   14:6, 14:7, 15:3, 15:16,
   23:22, 43:4 .
recovered 22:22 .
reduced 5:14, 24:24, 26:19,
   41:16 .
reduction 13:8, 29:18,
   30:2 .
references 16:11 .
referring 4:21 .
reflect 26:6 .
reflected 10:20 .
reflecting 10:8 .
reflects 11:9, 26:16,
   29:21 .

**regard** 6:8, 7:3, 7:12, 14:25, 29:3 .
**regarding** 4:12, 5:8, 5:25, 11:13, 15:8, 24:2, 25:24 .
**regardless** 22:7, 28:25, 42:8 .
**Registered** 35:16, 46:2 .
**regulations** 44:3, 46:8 .
**reiterate** 35:17 .
**related** 5:12, 5:24, 33:21 .
**release** 24:16, 25:7, 26:20, 29:20, 30:6, 41:19, 42:6, 43:11, 43:17, 43:20, 43:22 .
**released** 20:24, 32:2, 40:7 .
**reliable** 12:25 .
**relied** 9:11 .
**rely** 12:16, 13:24 .
**relying** 18:10 .
**remain** 2:20, 39:5, 43:2 .
**remains** 26:24 .
**remarkable** 41:6 .
**remember** 17:16 .
**remembers** 31:16 .
**reminded** 27:5 .
**remove** 2:23, 6:15, 34:20 .
**rendered** 12:1 .
**rent** 8:2 .
**rental** 7:22, 7:24, 8:2, 14:7 .
**repeated** 26:20, 30:5 .
**reply** 13:11, 18:14 .
**report** 3:5, 3:9, 3:15, 3:18, 4:10, 4:13, 6:20, 23:10, 24:17, 26:16, 39:24, 43:14 .
**Reporter** 46:1, 46:2, 46:3, 46:17 .
**represent** 2:16, 44:25 .
**Representing** 2:8 .
**request** 18:8, 33:4 .
**requested** 16:13 .
**requesting** 16:3 .
**requests** 23:10 .

**resale** 16:12, 16:18 .
**residence** 8:19 .
**residential** 44:7 .
**resold** 16:21, 23:5 .
**respect** 13:19, 19:21, 26:7, 28:9 .
**respectfully** 30:11 .
**responsibility** 8:10, 34:10, 39:21 .
**responsible** 11:17, 11:23 .
**Restitution** 42:13 .
**result** 2:23, 12:15, 13:8, 15:15, 15:20, 21:20, 24:11, 24:25, 30:20, 31:20, 38:15, 40:2, 40:6 .
**resulted** 26:21 .
**resupplier** 16:24 .
**returned** 10:15, 13:20 .
**review** 3:18, 4:10, 4:11 .
**reviewed** 5:21, 5:22, 6:4, 43:13 .
**ring** 23:2 .
**rise** 34:7, 41:8, 45:21 .
**risk** 34:2 .
**RMR** 46:16 .
**role** 2:21, 2:23, 8:11, 18:3, 18:18, 38:21 .
**Roman** 25:1 .
**roughly** 10:16 .
**ruined** 28:24, 30:8, 40:20 .
**rule** 18:14 .
**rules** 38:6, 44:3 .
**run** 42:6 .
.
.

**< S >**
**S.** 1:31 .
**sale** 18:23, 19:3 .
**sat** 35:21, 36:1 .
**satisfied** 4:11, 9:9 .
**saw** 14:13, 14:14 .
**saying** 45:15 .
**says** 9:18, 20:13 .
**scale** 16:11 .
**scenario** 20:6 .
**schedule** 32:8, 32:9 .
**scheduled** 4:2 .

**scheme** 21:5 .
**scrambling** 37:5 .
**se** 4:19, 6:14 .
**searches** 22:23 .
**seat** 2:3, 32:9 .
**seated** 2:16 .
**second** 28:6, 42:10 .
**section** 9:12, 19:18 .
**secure** 37:22 .
**secured** 37:8, 37:11 .
**securing** 37:25 .
**seek** 44:21 .
**seeking** 5:18, 19:17, 30:2 .
**seized** 7:20, 8:15, 8:18, 8:21, 10:12, 10:17, 13:16, 14:19, 15:17, 20:4, 27:10, 27:16, 27:24, 42:15 .
**seizure** 24:1 .
**seizures** 15:15 .
**self-incrimination** 41:5 .
**self-represented** 4:18 .
**selling** 18:22, 19:9, 21:18, 22:20 .
**send** 27:19, 39:14 .
**sending** 22:13 .
**sense** 13:25, 15:1, 28:3 .
**Sent** 3:19, 4:1, 16:19, 17:1, 17:17, 27:10, 32:21, 36:3 .
**sentence** 5:14, 6:1, 9:16, 9:18, 24:24, 25:5, 26:2, 26:6, 27:1, 27:13, 28:5, 28:12, 29:15, 29:16, 29:22, 30:3, 30:4, 30:11, 38:13, 38:22, 39:1, 40:6, 41:16, 41:23, 42:7, 42:20, 43:1 .
**Sentencing** 1:21, 2:10, 2:25, 4:2, 4:17, 4:19, 5:8, 5:19, 5:22, 6:4, 6:10, 9:3, 9:7, 9:17, 9:25, 13:8, 15:25, 19:17, 19:22, 20:23, 21:23, 22:2, 25:12, 25:21, 25:24, 28:11, 38:20, 43:4, 43:5 .

**September** 32:11, 32:14 .
**series** 7:23 .
**serious** 28:16, 29:11, 40:22 .
**seriously** 42:1 .
**seriousness** 26:6 .
**Service** 8:15, 17:22, 33:21 .
**services** 34:4, 34:5 .
**set** 41:25 .
**sets** 26:3 .
**several** 4:1, 4:6, 4:24 .
**shall** 2:20, 9:13 .
**She'll** 45:10 .
**shocking** 23:1 .
**short** 27:15 .
**shot** 27:6, 27:7, 27:9 .
**shouldn't** 21:24 .
**show** 14:8, 15:3, 17:7, 17:19, 17:24 .
**showed** 7:23, 8:3, 8:16, 16:8 .
**shown** 26:23 .
**sick** 40:17 .
**significant** 12:15, 13:7, 14:8, 14:9, 29:1, 30:17, 38:14, 40:1, 40:12 .
**significantly** 26:9 .
**silent** 39:5 .
**single** 22:21 .
**sir** 2:17, 4:13, 5:2, 5:9, 5:15, 5:19, 31:1, 32:11 .
**sit** 3:7 .
**slow** 29:20, 41:9 .
**snitch** 41:11 .
**society** 41:16 .
**sold** 18:25 .
**solely** 13:7 .
**somebody** 31:11, 33:13, 41:12 .
**soon** 45:2 .
**sorry** 3:11, 36:23 .
**sort** 6:4 .
**sorts** 19:1 .
**source** 8:9, 22:14 .
**Southwest** 18:24 .
**speaking** 2:21, 2:22, 31:13, 34:20, 38:3 .

**special** 25:9, 39:14, 41:21, 42:18, 43:20, 43:22, 43:23 .
**specific** 11:25 .
**specificity** 11:19 .
**speculate** 12:25, 13:22, 14:12, 14:21, 14:22 .
**speculated** 11:16 .
**speculating** 13:20 .
**speculation** 11:22, 12:6, 13:19, 14:17 .
**speculative** 11:14 .
**spell** 34:24 .
**spending** 29:1 .
**spite** 12:4 .
**spoke** 3:12 .
**spoken** 4:1 .
**stabbed** 31:23, 31:24, 35:23, 37:2, 37:15 .
**stabbing** 40:3, 41:12 .
**stand** 20:2, 22:17, 27:12, 41:3 .
**standard** 10:2, 43:17, 43:21 .
**standpoint** 30:1 .
**stands** 45:21 .
**start** 6:18, 10:22, 11:14, 35:3 .
**started** 35:23 .
**starts** 20:11 .
**state** 30:6, 34:23, 40:8 .
**stated** 21:22 .
**Statement** 12:19, 43:3 .
**States** 1:1, 1:5, 1:30, 2:7, 2:8, 9:2, 9:12, 10:1, 21:21, 22:2, 43:5, 43:6, 46:3, 46:9 .
**statutory** 9:12 .
**stenographically-reported** 46:6 .
**stenotype** 1:49 .
**stockholder** 8:20 .
**stolen** 21:18, 22:24, 23:2, 23:4, 23:15, 41:2 .
**stop** 7:21, 27:24, 28:2 .
**stored** 37:11 .
**Street** 1:31, 1:40, 29:10 .
**strength** 36:13 .
**submit** 43:24 .

**subpar** 33:18 .
**subsequent** 15:9 .
**Subsequently** 35:19, 35:22, 36:5 .
**substance** 43:24, 43:25, 44:2 .
**substantial** 29:14 .
**suffered** 31:4, 31:21, 40:1 .
**suffers** 30:19 .
**sufficient** 8:16, 29:22, 41:24 .
**sum** 5:17 .
**summarized** 5:24, 6:14 .
**summary** 16:22 .
**supervise** 44:4 .
**Supervised** 24:16, 25:7, 26:20, 29:20, 30:6, 41:19, 42:6, 43:11, 43:17, 43:20, 43:22 .
**supplement** 4:19 .
**supplemental** 5:22 .
**supply** 8:10, 22:14 .
**supplying** 16:17 .
**support** 18:3, 20:17, 36:25 .
**supports** 12:6, 24:4 .
**Supreme** 9:2, 9:7, 9:11, 9:22, 21:21 .
**surgeon** 31:13 .
**surgeons** 32:9, 32:10 .
**surgery** 32:8, 32:10, 32:14, 32:18, 36:7 .
**surprised** 38:3 .
**surprising** 23:2 .
**surveillance** 20:9 .
**suspect** 11:25 .
**sustain** 28:16, 29:11 .
**system** 40:5 .

.

.

**< T >** .
**T-r-a-c-y** 34:25 .
**table** 2:9 .
**tamper** 44:1 .
**tangible** 11:24 .
**telephone** 36:1 .
**tempers** 29:12 .
**tendon** 31:4, 31:14,

32:6 .
**term** 24:15 .
**terms** 14:3, 22:8 .
**Terrell** 16:6, 18:1 .
**test-i-lie** 20:1 .
**test-i-lie.** 21:25 .
**testified** 7:16, 12:14, 19:4, 22:4, 23:6, 23:21, 24:9 .
**testify** 11:19, 12:17, 19:25, 21:24 .
**testifying** 5:1, 23:13, 37:23, 40:25 .
**testimony** 7:15, 7:19, 7:25, 8:6, 8:13, 11:15, 12:15, 12:24, 13:7, 13:14, 14:5, 15:16, 18:10, 18:21, 19:11, 21:19, 21:25, 22:5, 22:9, 22:10, 22:12, 23:24, 27:12 .
**testing** 43:24, 44:1 .
**Thompson** 7:16, 8:22, 10:14, 11:14, 12:24, 13:6, 14:1, 16:6, 16:19, 19:5, 20:6, 20:14, 22:22, 23:4, 23:21, 26:13, 28:25, 38:8 .
**Thompson.** 20:14 .
**though** 34:1 .
**three** 3:1, 3:22, 25:6, 26:21, 29:18, 30:17, 36:21 .
**threw** 33:21 .
**throughout** 39:16 .
**Title** 9:12, 26:3, 28:10 .
**titles** 19:1, 22:24 .
**today** 4:5 .
**took** 20:2, 37:17 .
**top** 17:1, 29:19 .
**tore** 31:3 .
**torture** 32:3 .
**total** 5:17, 14:24, 24:20, 26:21, 41:22 .
**totality** 13:23 .
**touch** 20:23 .
**touched** 26:17 .
**towards** 20:22 .
**Tracy** 34:16, 34:21, 34:25, 39:14 .
**trade** 40:24 .
**trafficking** 20:2, 20:3, 22:5,

26:24, 41:3 .
**training** 44:11 .
**TRANSCRIPT** 1:20, 46:6, 46:7 .
**transcription** 1:49 .
**transferred** 33:9 .
**transport** 8:5 .
**transportation** 15:15, 23:15 .
**transported** 7:18 .
**transporting** 7:25 .
**treated** 31:12 .
**treatment** 31:10, 31:14, 32:4, 33:5, 33:18, 34:9, 35:18, 36:2, 36:5, 36:10, 41:8, 41:9, 44:2, 44:8 .
**trial** 2:12, 3:3, 5:2, 7:15, 15:14, 16:7, 18:20, 31:17 .
**trip** 11:18 .
**trips** 7:16, 7:23, 8:4, 14:6, 15:1, 15:3 .
**TRU** 8:20, 17:10 .
**true** 46:5 .
**try** 17:25, 37:5 .
**trying** 21:3, 21:14, 32:3, 38:8 .
**Tucson** 7:17, 7:24, 10:15, 16:19, 27:19 .
**Two** 3:22, 5:7, 14:2, 15:3, 17:6, 17:17, 18:12, 23:10, 28:9, 30:16, 31:6, 32:10 .
**two-level** 4:25, 18:9, 18:19, 19:18, 19:22 .
**type** 6:24, 14:16, 15:8 .

.

**< U >** .
**U.S.** 1:46, 2:9, 8:14, 10:1 .
**Ultimately** 31:23, 32:20 .
**unaware** 38:4 .
**underlying** 14:20 .
**understand** 12:2, 13:2, 14:18, 33:15, 36:12, 37:14, 37:18, 38:1, 38:23, 41:7, 42:3 .

57

**understanding** 25:14, 31:12, 31:19, 32:24, 38:16, 38:17, 38:19 .
**understands** 19:24, 29:5 .
**Understood** 18:11, 38:2 .
**undeterred** 26:24 .
**unfortunate** 26:15 .
**unfortunately** 38:10 .
**United** 1:1, 1:5, 1:30, 2:7, 2:8, 9:2, 10:1, 21:21, 22:2, 43:5, 43:6, 46:3, 46:9 .
**University** 32:2 .
**unless** 2:20, 9:21 .
**until** 20:15, 26:14, 32:14, 32:16 .
**untruthful** 19:11 .
**upside** 33:22 .
**upwards** 7:18 .
**using** 17:15, 17:20 .
**utilizing** 14:24 .
.
.
**< V >** .
**v.** 9:2, 10:1, 21:21, 22:2 .
**vaccinated** 2:21, 2:22, 6:16, 11:4, 30:19, 34:2, 34:20, 39:10 .
**vaccine** 33:25 .
**vaxxed** 34:21 .
**vehicle** 19:1, 20:11 .
**vehicles** 18:24, 23:15 .
**verdict** 8:24, 9:4, 11:9, 11:22, 12:1, 12:3, 12:5, 13:20, 15:10 .
**verdicts** 38:23 .
**versus** 2:7 .
**VI** 25:1, 25:3 .
**video** 37:7, 37:11, 37:21, 37:22 .
**view** 3:4 .
**violation** 21:2, 29:19 .
**violations** 26:20, 26:22, 30:5 .
**violence** 40:22 .
**violent** 28:17 .
**virus** 34:3 .

**visits** 3:22, 4:6 .
**vocational** 44:11 .
**vs** 1:8 .
.
.
**< W >** .
**waiting** 17:7, 36:1 .
**wake** 40:19 .
**Walton** 16:6, 18:1, 37:2, 37:8, 38:16, 38:21, 38:24 .
**wanted** 3:25, 28:24 .
**warranted** 9:19, 16:25 .
**warrants** 30:2 .
**Watts** 9:3, 9:11 .
**weather** 8:4 .
**welcome** 36:18 .
**whatever** 22:25, 30:3, 33:6, 37:7 .
**Whether** 7:4, 9:19, 15:22, 17:2, 21:10, 25:22, 45:3 .
**whole** 21:5, 24:7 .
**will** 7:21, 8:13, 15:20, 16:24, 17:6, 24:11, 24:12, 28:7, 28:13, 33:6, 41:25, 42:5, 42:17, 42:18, 43:2, 43:3, 43:4, 44:4, 44:15, 44:16, 44:24, 45:3, 45:11, 45:12, 45:16 .
**willfully** 19:19, 22:16, 23:6 .
**Winston** 27:5 .
**wiretap** 16:8 .
**within** 4:23, 9:19, 23:18, 25:1, 42:20 .
**Without** 40:11 .
**witness** 12:25, 22:7, 27:12 .
**witnesses** 13:15 .
**woman** 21:11 .
**word** 28:3 .
**words** 24:15 .
**work** 21:12 .
**world** 27:6 .
**worse** 33:12 .
**writing** 45:9 .
.
.

**< Y >** .
**yanked** 21:1 .
**years** 9:2, 25:6, 25:8, 26:22, 29:14, 29:16, 29:19, 30:4, 30:12, 35:16, 38:14, 38:16, 39:21, 41:16, 41:20, 42:6 .